**CANTOR FITZGERALD, L.P., Plaintiff,**

v.

**Iris CANTOR, Individually, and as De Facto Trustee of the Cantor Family Trust, and Iris Cantor as Trustee of the Michelle Labozzetta Trust, Iris Cantor as Trustee of the Suzanne Fisher · Trust, Iris Cantor as Trustee of the Howard Lutnick Trust, Iris Cantor as Trustee of the Stuart Fraser Trust, Iris Cantor as Trustee of the Monica Muhart Trust, and Iris Cantor as Trustee of the Randi Ross Trust, Cantor Fitzgerald Incorporated, Rodney Fisher, Market Data Corporation and Chicago Board Brokerage, L.L.C., Defendants.**

C.A. No. 16297.

Court of Chancery of Delaware, New Castle County.

Submitted: July 10, 1998.

Decided: July 12, 1998.

Rodman Ward, Karen L. Valihura, Joseph M. Asher and George F. Fraley, III of Skadden, Arps, Slate, Meagher & Flom, Wilmington; Thomas J. Schwarz and Jeremy A. Berman of Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel for Plaintiff.

Lawrence C. Ashby, Stephen E. Jenkins, Richard D. Heins and Richard I.G. Jones, Jr. of Ashby & Geddes, Wilmington; Jack C. Auspitz and Howard E. Heiss of Morrison & Foerster, New York City; Steven M. Weinberg of Weinberg Sullivan, Phoenix, Arizona; Barry I. Slotnick, J. Lawrence Crocker and Joshua T. Rabinowitz of Slotnick Shapiro & Crocker, New York City; David F. Dobbins and Saul B. Shapiro of Patterson, Belknap, Webb & Tyler, New York City, of counsel for Defendants Iris Cantor, Cantor Fitzgerald Incorporated, Rodney Fisher and Market Data Corporation, of counsel.

Martin P. Tully and William Lafferty of Morris, Nichols, Arsht & Tunnell, Wilmington; Josef J. Riemer, Ellen M. Moskowitz and Mark A. Racanelli of Kirkland & Ellis, New York City, of counsel for Defendant Chicago Board Brokerage, L.L.C.

## *OPINION*

STEELE, Vice Chancellor.

Cantor Fitzgerald, L.P. ("CFLP" or "Plaintiff"), a Delaware limited partnership, alleges that three of its limited partners, working through Market Data Corporation ("MDC"), a Delaware corporation under their control, and in conjunction with Chicago Board Brokerage, L.L.C. ("CBB"), an unassociated Delaware limited liability corporation, have developed a product that will compete directly with CFLP's core business. Plaintiff CFLP seeks to preliminarily enjoin the new product's launch on July 31, 1998. Plaintiff may obtain a preliminary injunction if it establishes the following three elements: (1) a reasonable likelihood of success on the merits, (2) imminent, irreparable harm will result if an injunction is not granted and (3) the damage to Plaintiff if the injunction does not issue will exceed the damage to the defendants if the injunction does issue.[1] Although I find the evidence establishes that CFLP has a reasonable likelihood of establishing at a trial on the merits that defendant limited partners breached their fiduciary duty of loyalty to the general partner and the partnership, I am also compelled by the present record to conclude that CFLP will not suffer imminent harm so damaging to its core business resulting from the breach of that duty of loyalty that it exceeds the harm to the defendants if they are enjoined from further development and use of MarketPower pending a final hearing.

Because issues remain unsettled on the record about MDC's factual assertions on waiver resulting from a prior pattern of acquiescence, Plaintiff's claims of breach of confidentiality and appropriation of trade secrets and the efficacy and appropriateness of the imposition of a constructive trust, a final hearing on the merits will be scheduled during a telephone conference at 2:00 p.m. Monday, July 13, 1998.

## BACKGROUND

Plaintiff CFLP is a leading inter-dealer and institutional broker of United States Treasury securities and other government securities. Three of the defendants in this action, Iris Cantor ("Cantor"), Rodney Fisher ("Fisher"), and Cantor Fitzgerald Incorporated ("CFI") (collectively "Limited Partner Defendants"), are Limited Partners in CFLP. Cantor, in addition to being a Limited Partner of CFLP, is also the Vice Chairman of CFLP and the owner[2] and CEO of CFI.

MDC, a fourth defendant in this action, is a Delaware corporation that was once a department within CFLP. CFLP spun off MDC in 1987 in order to enhance the focus of MDC's business as a separate profit center. MDC has two lines of business. The "data enhancement" business consists of collecting, adding value to, re-formatting and distributing financial data to CFLP's customers and competitors. The "software distribution" business consists of building electronic trading systems for license to brokers and other financial services entities, some of which are CFLP's competitors. Cantor is majority shareholder of MDC,[3] and Fisher is MDC's Chairman and CEO.

---

1. *Mills Acquisition Co. v. Macmillan, Inc.*, Del. Supr., 559 A.2d 1261, 1279 (1989).

2. Cantor owns CFI through the Iris Cantor Trust, of which Cantor is grantor, trustee and sole beneficiary.

3. Cantor is the majority shareholder of MDC

The fifth defendant is CBB, a Delaware limited liability company. CBB is a joint venture of Ceres Trading Limited Partnership, a limited partnership controlled by the Chicago Board of Trade, and Prebon Yamane ("Prebon"), a broker/competitor of CFI. "CBB was formed to develop a new and more efficient way of brokering and trading Treasuries—through an interactive electronic trading system...."[4]

CFLP filed this action after CBB announced that, on July 13, 1998,[5] it will launch a new electronic trading system called "MarketPower." CFLP contends the new system is intended to compete directly against CFLP in its "historic core business"—the brokerage of U.S. Treasuries. CBB concedes that, through MarketPower, it "intends to bring full and fair competition to the Treasuries market," which is currently "dominated by plaintiff CFLP."[6] CBB contends its system will "democratize" dealing in Treasuries by breaking a CFLP monopoly in benchmark issues and by opening access for "second and third tier" dealing to a broader market, long dominated by "primary" dealers.

CBB developed the specifications for MarketPower and searched for approximately four years for a vendor to build the system. The evidence clearly shows CBB's options to have been few, with even the most serious discussion with alternative suppliers resulting in no formal proposal. Ultimately, CBB chose MDC as its vendor because it could perform consistently within the specifications in CBB's "functional requirements"[7] and because it could develop the software within an acceptable time and on acceptable financial terms.[8]

Although CBB did not sign a formal contract with MDC until February 9, 1998, and did not announce the impending launch of MarketPower until March 19, 1998, CFLP learned from one of its employees that MDC was close to signing a contract with CBB to develop an electronic trading system at least as early as September of 1997. On October 6, 1997, CFLP sent a letter to Cantor, Fisher and MDC objecting to MDC's role as CBB's software vendor. CFLP claimed that the activity constituted a breach of the 1996 Agreement of Limited Partnership of Cantor Fitzgerald, L.P. ("Limited Partnership Agreement" or "1996 Agreement"). CFLP knew that its warnings were going unheeded, however, in November of 1997, when a CFLP employee attended a high-profile, industry-wide, public demonstration of the MarketPower software that MDC built for CBB. Plaintiff did not initiate this action until April 6, 1998. Shortly after filing the Complaint, CFLP filed a Motion for Preliminary Injunction to prevent the July launch of MarketPower.

Plaintiff never expressed any concern directly to CBB about the propriety of using MDC as CBB's software vendor. Nevertheless, CBB learned of the allegations in CFLP's October 6, 1997, letter later that month, through MDC. Fisher assured CBB, however, as he had from the start of the companies' negotiations in June of 1997, that CFLP and MDC were separate companies and that CFLP's allegations were baseless. Fisher's representations accorded with David E. Rutter's, the Prebon co-chair of CBB, memory of a highly-publicized falling out between the principals of MDC and CFLP.[9] In

---

through the Iris Cantor Trust.

4. CBB's Memorandum of Law is Support of Its Motion to Dismiss the Complaint at 2–3 (hereafter "CBB's Open. Dismiss Br.").

5. It now appears that CBB plans to beta test the 28 screens it has installed with 7 customers on July 13, 1998, but that the actual interactive trading on the system will not begin until July 31, 1998. Direct Examination of David E. Rutter, Transcript Vol. III at 550 (July 8, 1998).

6. CBB's Open. Dismiss Br. at 3.

7. Direct examination of David E. Rutter, Transcript Vol. III at 554–55 (July 8, 1998).

8. CBB's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction at 4 (hereafter "CBB's Opposing P.I. Br.").

9. Direct Examination of David E. Rutter, Transcript Vol. III at 566–67 (July 8, 1998) ("I do read the papers, and there was an awful lot written about ... the family feud, which is the split between ... Iris Cantor and Howard [Lutnick]. And it seemed to me that there was clearly a separation that was achieved at that time....").

addition, Fisher agreed, in the June 1997 negotiations, to include a provision in any future agreement between MDC and CBB that MDC would "give [CBB] the software for free" [10] should CFLP ever materially interfere in the venture.

Rutter called Patriot Securities and Tullet & Tokyo, mutual competitors of CFLP and Prebon, to confirm that MDC had done work for them and to inquire about the nature and quality of MDC's work. Rutter did not contact CFLP to explore the nature and scope of its objection to MDC's collaboration with CBB, nor did he authorize anyone else from CBB to do so. Fisher, Patriot and Tullet apparently succeeded in comforting Rutter, however, because CBB eventually determined, in its business judgment, to take the calculated risk of contracting with MDC to develop MarketPower, even in the face of CBB's knowledge of CFLP's reputation for aggressive litigation.[11] CBB did receive contractual assurances from MDC, consistent with what was promised in the June 1997 negotiations. The Agreement Between Chicago Board Brokerage, L.L.C., and Market Data Corporation (the "CBB/MDC Software Licensing Agreement") provides that if CFLP ever materially interferes with MDC's participation in the CBB/MDC deal, MDC will be in material breach of the CBB/MDC Software Licensing Agreement, and CBB may terminate the agreement and look to its rights as stated in paragraphs 8.3 and 11.3.[12] Thus, between October of 1997, and April of 1998, in reliance on MDC's and others' assurances, CBB "made substantial commitments ... to prepare for the launch of MarketPower, including hiring more staff and undertaking the significant task of building a network to support the system."[13] Despite seeing caution flags waved, CBB intends to begin beta testing of the system already in place with seven current customers on July 13, 1998, and it will launch trading through MarketPower on July 31, 1998.

I conducted a hearing on Plaintiff's Motion for a Preliminary Injunction on May 26, 1998 and on July 6—10, 1998.

## CONTENTIONS OF THE PARTIES

### A. Plaintiff's Contentions

CFLP contends that it has a reasonable likelihood of success on the merits of its Complaint based on its interpretation of the Limited Partnership Agreement and on Delaware case law. Count I of the Complaint alleges that the Limited Partner Defendants, by allowing or causing MDC to collaborate with CBB to develop and sell a product intended to compete directly against CFLP in its "historic core business," breached a fiduciary duty of loyalty owed to CFLP pursuant to section 3.03(b) of the Limited Partnership Agreement. Count III alleges that Cantor and CFI breached the 1996 Agreement by engaging in a Competitive Activity or Competing Business in violation of section 3.03(a). Counts II, IV and V of the Complaint, respectively, assert against MDC and CBB claims of aiding and abetting the Limited Partner Defendants' breach of their duty of loyalty, tortious interference with the Limited Partnership Agreement, and unjust enrichment.

CFLP also contends that, if MarketPower launches as planned, CFLP will suffer irreparable injury in the form of lost customers and lost market share. In addition, CFLP argues that it will have to lower its commissions to match CBB's lower prices. Thus, CFLP explains, it will be caught in a "vice"— charging lower commissions on fewer trades. CFLP explains this will cause a substantial loss in profitability, which will, in turn, damage its ongoing business prospects. Lost profitability, CFLP argues, will hinder its ability to fund its diversification program, which includes expansion into Europe and Canada. Of particular concern to CFLP is the requirement that it raise $20 million by January 1, 1999, in order to continue to expand into Europe in advance of the advent

---

10. *Id.* at 567.

11. Cross Examination of David E. Rutter, Transcript Vol. III at 632 (July 8, 1998).

12. Section 8.3 requires MDC to indemnify CBB, and section 11.3 secures CBB's right to receive the software for free.

13. CBB's Opposing P.I. Br. at 8.

of the Euro.[14] Plaintiff also explains that if it cannot raise the required $20 million, it will have missed a major, historic opportunity in the world Treasuries markets. CFLP claims it will be unable to afford this substantial deposit during a time of declining profitability and market share. CFLP also contends that, during the pendency of this litigation, it cannot "in good conscience" seek further capital contributions from its partners and that it is at all times contractually prohibited from borrowing the full amount of the required deposit from commercial lenders. CFLP next argues that, once MarketPower is released, CFLP will lose its status as the company whose interest rate is the "benchmark by which U.S. Treasury interest rates are judged," a development that "could undo [CFLP's] business [in] its entirety." '[15] Finally, CFLP argues that the July release of MarketPower will cause its other limited partners to withdraw from the limited partnership. None of these injuries, CFLP argues, can be adequately quantified and fully remedied, even after a final hearing on the merits.

CFLP next argues that the harm it will suffer if I refuse to issue an injunction substantially outweighs the harm that defendants will suffer if I grant injunctive relief because CFLP is obligated to pay Cantor and CFI substantial sums under various agreements they have entered into over the years. CFLP believes it is unfair to allow its limited partners to collect these sums from CFLP and, at the same time, earn additional income from a business that will injure CFLP. Plaintiff further contends that the issuance of a preliminary injunction is in the public interest because it will support the policy of enforcing unambiguous contracts and because if it is later determined that the release of MarketPower must be permanently enjoined, "third parties who have contract-

ed to receive its services may face their termination of this new service." [16]

**B. Defendants' Contentions**

The Limited Partner Defendants contend that Plaintiff is not likely to succeed on the merits of its claims against them because the 1996 Agreement expressly allows them to compete with CFLP. Alternatively, Defendants argue that the terms of the 1996 Agreement, as they pertain to a limited partner's right to compete, are ambiguous, but that extrinsic evidence proves that the Limited Partner Defendants are allowed to compete with CFLP. Further, Defendants argue that even if the 1996 Agreement, by its terms, prohibits limited partners from competing with CFLP, the Limited Partner Defendants have earned the right to compete with CFLP through the parties' prior course of dealing. Finally, Defendants argue that Plaintiff is not reasonably likely to succeed on the merits of its aiding and abetting, tortious interference and unjust enrichment claims because it is unable to prove at least one fundamental element of each claim.

Defendants next contend that in the anticipated short space of time between MarketPower's launch and the final hearing on the merits, Plaintiff will not suffer irreparable harm for which a preliminary injunction is the only effective remedy. CFLP proclaims itself "the world's largest broker of United States Treasury securities" [17] and "the world leader in dollar volume and market share in the brokerage and trading of Treasuries." [18] Its market share is approximately 35–40 percent of all U.S. Treasuries and is above 70 percent in the U.S. Treasury 30–year benchmark. CBB, created solely to develop this electronic trading system for Treasuries, in contrast argues it is a fledgling competitor designed to appeal to "second and third tier" dealers, not primary dealers, and will have substantial difficulty achieving market pres-

---

14. It appears that raising the $20 million may be required by the European regulatory authorities.

15. Plaintiff's Opening Brief in Support of its Motion for Preliminary Injunction at 63 (hereafter "P's Open. P.I. Br.") (quoting Deposition of Howard Lutnick, May 12, 1998, at 223 (hereafter "Lutnick Depo.")). *See also* Direct Examination

of Howard Lutnick, Transcript Vol. I at 133 (July 6, 1998).

16. P's Open. P.I. Br. at 70.

17. P's Open. P.I. Br. at 1.

18. P's Open. P.I. Br. at 59.

ence for years. CFLP attributes its popularity with customers to, among other things: its excellent customer service, its personal relationships with customers, its reputation for integrity, its ability to handle large transactions and its ability to ensure anonymity when trading. Cantor and her expert witness, William James Kenney, contend, even more importantly, that pricing and liquidity advantages that CFLP brings to trading and to customers outweigh the attractiveness of a start-up electronic trading venture with only seven customers and twenty-eight potentially active screens.[19] These standards of excellence, all Defendants argue, will not be affected by MarketPower's launch. Moreover, MarketPower is a new product, as yet untested in a wide commercial market, and Plaintiff has conceded that being the first to market with a new product always entails risk.

Defendants contend that given CBB's size and lack of market presence, the risks associated with the introduction of a new technology, CFLP's dominance in the U.S. Treasuries market, CFLP's excellent reputation with customers, its pricing and liquidity advantages and the short period of time that will elapse before a final hearing, it is highly speculative that CFLP will suffer any injury at all at the hands of CBB and MarketPower. Defendants then concede, however, that Plaintiff might lose some customers and profits. Nevertheless, Defendants argue, to the extent that CFLP does lose customers to MarketPower in the short period of time between its launch and the final hearing on the merits, CFLP will be able to discern the identity of those customers and to calculate the amount of lost profits those customers represent. Defendants also note that CFLP has developed its own electronic trading system that will soon be ready for launch. Should CFLP's product be launched before the final hearing on the merits,[20] and should that product be attractive to customers, CFLP may regain the customers previously lost and mitigate any injury that may be caused by MarketPower. In any event, Defendants argue, I need not issue a preliminary injunction because, after the final hearing on the merits, I will be able to make Plaintiff whole by awarding money damages and, if necessary, a permanent injunction or other equitable relief.

If I were to issue a preliminary injunction later determined to have been granted improvidently, however, Defendants argue it would be impossible to make them whole. Thus, Defendants argue that the balance of the equities favors denying the preliminary injunction. One critical aspect of the parties' respective equities, Defendants contend, is Plaintiff's delay in filing suit. Plaintiff knew at least as early as October of 1997, that MDC and CBB were working on an electronic trading system, yet CFLP did not promptly file suit. Instead, Plaintiff waited until April of 1998, to seek injunctive relief, approximately five months after the high-profile, industry-wide public demonstration of MarketPower and approximately two months after MDC and CBB signed the CBB/MDC Software Licensing Agreement. By the time CFLP filed its Motion for Preliminary Injunction, Defendants argue, both MDC and CBB had expended large sums of money on personnel and equipment, not to mention a great deal of time and effort.

If the preliminary injunction is granted, MDC explains that it will lose the time and money already invested in MarketPower, as well as the projected earnings from the system. More importantly, however, MDC believes it will be precluded from completing sales of other trading systems. MDC argues that a precedent suggesting that its business transactions are subject to CFLP veto would place a "stranglehold" on MDC's business with third parties. MDC contends that there will be no way to quantify the business lost and the harm to MDC's reputation between the dates the preliminary injunction is issued and is later vacated.

**19.** Direct Examination of Walter James Kenney, Transcript Vol. IV at 779 (July 9, 1998); Cross Examination of Walter James Kenney, Transcript Vol. IV at 812 (July 9, 1998).

**20.** It is unlikely that the parties can agree they will be prepared to hold the final hearing on the merits before CFLP releases its electronic trading system, which is likely to be this September. Direct Examination of Howard Lutnick, Transcript Vol. I at 77 (July 6, 1998).

CBB argues that if Plaintiff's Motion for Preliminary Injunction is granted, the injury to CBB will far outweigh any injury Plaintiff might suffer. CBB was created solely to develop this electronic trading system, and CBB argues that its entire business depends on the system's timely launch. Many of CBB's more-established competitors in the securities industry, including CFLP, soon will be releasing electronic trading systems.[21] For a fledgling company like CBB with little market presence, CBB argues, it is critical to be first to market with the new technology. CBB contends that any delay caused by a preliminary injunction, certainly one allowing CFLP to be first in the market, could remove CBB's biggest competitive advantage and "cripple" CBB's long-term potential. Should the preliminary injunction later be determined to have been granted improvidently, moreover, it will be impossible to quantify and remedy CBB's injury. Finally, CBB argues that the issuance of a preliminary injunction would harm the public interest by postponing full and fair competition that would make trading Treasuries more convenient and less costly for consumers.[22]

**DISCUSSION**

 The extraordinary remedy of a preliminary injunction "is granted sparingly and only upon a persuasive showing that it is urgently necessary, that it will result in comparatively less harm to the adverse party, and that, in the end, it is unlikely to be shown to have been issued improvidently."[23] Plaintiff may obtain a preliminary injunction if it establishes the following three elements: (1) a reasonable likelihood of success on the

merits, (2) imminent, irreparable harm will result if an injunction is not granted and (3) the damage to Plaintiff if the injunction does not issue will exceed the damage to the defendants if the injunction does issue.[24] The elements are not necessarily weighted equally. A strong showing on one element may overcome a weak showing on another element. However, a failure of proof on one of the elements will defeat the application.

Because Plaintiff has established only one of the elements to my satisfaction, a short time frame between this decision and a final hearing on the merits is contemplated and I cannot fashion a form of preliminary injunction that could issue, specifically tailored to both maintain the status quo as I see it and to minimize any adverse consequences to the parties pending a final hearing,[25] the application must be denied.

**A. Reasonable Likelihood of Success on the Merits**

 "[T]he applicable standard on a motion for preliminary injunction falls well short of that which would be required to secure final relief following trial, since it explicitly requires only that the record establish a reasonable probability that this greater showing will ultimately be made."[26] Where, as here, the critical disputes between the parties are disputes of fact, a court will find that Plaintiff has a reasonable probability of success on the merits if, after considering all evidence currently in the record, the court believes it to be reasonably likely that, at the final hearing, Plaintiff will establish the necessary facts by a preponderance of the evidence.[27] Counts I and III of the Complaint

21. All of the parties agree that the electronic trading of securities is "the wave of the future" and that the whole industry is moving in that direction.

22. CFLP contends that if MarketPower is introduced, CFLP will be forced to lower substantially its commissions in order to match CBB's prices and, in fact, asserts this is a critical element in analyzing its imminent, irreparable injury. Once lowered, history suggests, the market will not accept increases. Direct Examination of Howard Lutnick, Transcript Vol. I at 106–08 (July 6, 1998).

23. Donald J. Wolfe, Jr. and Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 10–2(a).

24. *Mills Acquisition Co. v. Macmillan, Inc.*, Del. Supr., 559 A.2d 1261, 1279 (1989).

25. *See Brinati v. TeleSTAR, Inc.*, Del. Ch., C.A. No. 8118, 1985 WL 44688 at *5, Berger, V.C. (Sept. 3, 1985)(tailoring injunctive relief to serve the needs of the parties).

26. Wolfe and Pittenger, *supra* note 12 at § 10–2(b)(2).

27. *Id.* (citing *Paramount Commun., Inc. v. Time, Inc.*, Del. Ch., C.A. No. 10866, Allen, C., 1989

580

allege, respectively, that the Limited Partner Defendants breached their fiduciary duty of loyalty and engaged in a Competitive Activity or Competing Business in violation of the Limited Partnership Agreement.[28] In order to assess Plaintiff's likelihood of success on the merits of these claims, I must examine pertinent provisions of the Agreement.

Section 3.03(b) of the Limited Partnership Agreement states:

"Each Partner acknowledges its duty of loyalty to the Partnership and agrees to take no action to harm (or that would reasonably be expected to harm) the Partnership or any Affiliated Entity."

The Limited Partner Defendants are "Partners," [29] and Plaintiff contends they are, as a result, bound by the terms of section 3.03(b). CFLP contends that the Limited Partner Defendants, by allowing MDC to contract with CBB to develop a product that will compete with CFLP in its core business, breached their fiduciary duty of loyalty to CFLP and took an action that would reasonably be expected to harm CFLP.

Section 3.03(a) states, in pertinent part:

"Nothing contained in this Agreement shall be deemed to preclude the Managing General Partner, CFI or any of their respective Affiliates from engaging or investing in or pursuing, directly or indirectly, any interest in other business ventures of every kind, nature or description independently or with others; *provided*, that such activities do not constitute Competitive Activities." [30] .

The 1996 Agreement states that " 'Competitive Activity' shall have the meaning given in Section 11.04(c)." Section 11.04(c) states, in pertinent part:

"[A] Partner shall be considered to have engaged in a Competitive Activity if such Partner while a Partner . . .

(ii) solicits any of the customers of the Partnership or any Affiliated Entity (or any of their employees), induces such customers or their employees to reduce their volume of business with, terminate their relationship with or otherwise adversely affect their relationship with, the Partnership or any Affiliated Entity . . .

(iv) directly or indirectly engages in, represents in any way, or is connected with, any Competing Business, directly competing with the business of the Partnership or of any Affiliated Entity, whether such engagement shall be as an officer, director, owner, employee, partner, consultant, affiliate or other participant in any Competing Business or

(v) assists others in engaging in any Competing Business in the manner described in the foregoing clause (iv)." [31]

CFLP contends that the Limited Partner Defendants, by allowing or causing MDC to help CBB develop and sell MarketPower, a product that will compete directly against CFLP in its core business of brokering U.S. Treasuries, have: (1) "solicit[ed] the customers of CFLP to reduce their volume of business with CFLP" in violation of section 11.04(c)(ii), (2) "directly engag[ed] in a Competing Business" in violation of section

WL 79880 (July 14, 1989), mem. op. at 5, *aff'd*, Del.Supr., 571 A.2d 1140 (1989)).

**28.** I express no opinion as to whether a duty of loyalty may have existed in the absence of the express provision in the 1996 Agreement of Limited Partnership of Cantor Fitzgerald, L.P. (hereafter "Limited Partnership Agreement").

**29.** The Limited Partnership Agreement defines "Partner," in part, as "the General Partners and the Limited Partners." Limited Partnership Agreement § 1.01.

**30.** Limited Partnership Agreement § 3.03(a) (italics in original). Cantor and MDC appear to be Affiliates of CFI. Limited Partnership Agreement § 1.01. (defining "Affiliate" as any person or entity "that directly or indirectly through one

or more intermediaries controls or is controlled by or is under common control with the specified [person or entity]").

**31.** A Competing Business:

"(i) involves the conduct of the wholesale or institutional brokerage business, (ii) consists of marketing, manipulating or distributing financial price information of a type supplied by the Partnership or any Affiliated Entity to information distribution services or (iii) competes with any other business conducted by the Partnership or any Affiliated Entity if such business was first engaged [in] by the Partnership or an Affiliated Entity. . . ."

Limited Partnership Agreement § 11.04(c).

11.04(c)(iv) and (3) "assist[ed] others in engaging in [a] Competing Business" in violation of section 11.04(c)(v).[32]

The Limited Partner Defendants, however, contend that three other provisions of the 1996 Agreement, not cited by Plaintiff, expressly *grant* them the right to compete with Plaintiff. Defendants first cite section 1.02(b), which states:

> "The Partnership hereby grants to CFI a perpetual, worldwide non-exclusive license ... to use the name 'Cantor Fitzgerald' in connection with its business and activities; *provided, however,* that CFI shall not have the right to utilize such license to conduct any Competing Business." (Emphasis in original).

Defendants then refer me to the following sentence from section 11.02(c):

> "Nothing in this Article XI shall be considered or interpreted as restricting the ability of [a] Partner in any way from engaging in any Competing Activity, or in other employment of any nature whatsoever."

Finally, Defendants cite section 11.02(d):

> "A partner who *chooses* to engage in a Competitive Activity shall be entitled to receive all amounts payable pursuant to Section 11.03 and shall be entitled to receive additional amounts as are provided in Section 11.04 to the extent that such amounts are payable prior to the date on which a Partner first participates in a Competitive Activity." (Emphasis added).

■ The Limited Partner Defendants contend that these provisions prove that CFLP is not reasonably likely to succeed on the merits of its breach of fiduciary duty claims because the provisions expressly permit any limited partner to compete with CFLP. Alternatively, Defendants argue that the foregoing provisions conflict with the provisions that CFLP contends prohibit competition

and that the Limited Partnership Agreement is, therefore, ambiguous. Defendants have offered extensive extrinsic evidence they contend I may consider to resolve the ambiguity.

■ The foregoing provisions cited by the Limited Partner Defendants, when read in the context of the entire 1996 Agreement, support rather than contradict Plaintiff's interpretation. Thus, I find that the 1996 Agreement clearly and unambiguously prohibits CFLP's limited partners from engaging in a Competitive Activity or a Competing Business. Because the 1996 Agreement is clear on its face, Defendants' extrinsic evidence may not be considered.[33]

Section 1.02(b) explains the conditions under which CFI may use the Cantor Fitzgerald name; it does not grant CFI, much less any other limited partner, the right to compete with CFLP. Because section 1.02(b) states that CFI may not use the Cantor Fitzgerald name if CFI is engaged in a Competing Business, a reader may infer that there *are* circumstances under which CFI may compete with CFLP, however, the reader would only be able to determine the precise circumstances under which CFI may compete by reading the rest of the contract. When section 1.02(b) is read in conjunction with section 3.03 and Article XI, it is clear that CFI may choose to compete with CFLP after CFI ceases to be a limited partner.[34] Section 1.02(b) provides that, in that circumstance, CFI may not use the Cantor Fitzgerald name.

■ Subsections 11.02(c) and (d), when read in their entirety and in conjunction with the rest of the Limited Partnership Agreement, also dovetail into the Agreement's overall scheme. Article XI is entitled: "Withdrawal; Transfer and Admission of Additional Limited Partners," and it covers situations not present in this action.[35] Defen-

---

**32.** P's Open. P.I. Br. at 15. The quotation includes Rodney Fisher, but CFLP has since conceded that § 3.03(a) of the Limited Partnership Agreement does not apply to Fisher.

**33.** *Northwestern Nat'l Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 43 (1996).

**34.** By its terms, Article XI applies to Partners who have been Terminated or who are in Bank-

ruptcy. Limited Partnership Agreement § 11.02(c). Termination and Bankruptcy are defined terms in the Limited Partnership Agreement. *Id.* § 1.01.

**35.** Although contract headings are not controlling evidence of the meaning of a contract's substantive provisions, they may be considered

dants rely on the second sentence of section 11.02(c) in support of their argument, but they· fail to explain how that sentence is affected by the immediately preceding sentence: "Each Partner acknowledges that this Article XI is intended solely to reflect the economic agreement between the Partners with respect to amounts payable upon a Partner's Bankruptcy or Termination."[36] When read together, it is clear that subsections 11.02(c) and (d) provide that if a Partner is Terminated or is Bankrupt, it may seek to earn income in any manner it wishes. The caveat, however, is that if the former limited partner chooses to earn its income by competing with CFLP, it will not receive, in exchange for its Units, any of the additional amounts it would otherwise be entitled to under section 11.04.[37] Subsections 11.02(c) and (d) do not grant Defendants the right to compete with CFLP.

Based solely on the terms of the 1996 Agreement, I find it reasonable to conclude Plaintiff is likely to succeed on the merits of its breach of fiduciary duty claims. Where a fiduciary duty of loyalty is expressly written into an agreement, or where authority is granted to include this provision at a later time, I must conclude that the parties bargained for the provision. That Delaware courts uphold bargained-for fiduciary duties contained in limited partnership agreements is crucial to the orderly management of, and the related, economic success of, those limited partnerships.

▄▄▄ Defendants, however, contend that regardless of the Limited Partnership Agreement's terms, CFLP should be estopped from raising a claim for breach of fiduciary duty under that Agreement. Defendants contend that the parties' prior course of dealing, establishes that CFLP routinely acquiesced in Defendants' competition with CFLP. Defendants, therefore, reasonably believed their alliance with CBB to be permissible under the 1996 Agreement. "Acquiescence arises where a complainant has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved."[38]

Defendants contend that since 1993, the year CFLP first inserted the language currently found in sections 3.03(a), 3.03(b) and 11.04(c) of the 1996 Agreement, MDC has completed, or has proposed and negotiated, many transactions with CFLP's competitors that would arguably constitute Competitive Activities or Competing Businesses, or that might arguably be considered violative of the Limited Partner Defendants' duty of loyalty and harmful to CFLP. Defendants contend that Plaintiff never objected to, or sought to enjoin, these dealings, notwithstanding that some allegedly involved the development of electronic trading systems for companies that compete directly with CFLP. Thus, Defendants contend that Plaintiff led them to believe that their alliance with CBB was also permissible under the 1996 Agreement.

In support of their argument, Defendants provided the details of several transactions between MDC and CFLP's competitors. I am not, however, concerned with, and this case does not turn on the significance of, any of Defendants' data enhancement deals. CFLP has not yet attempted to enjoin MDC from pursuing that line of business, which also appears to fit within the broad definition of Competitive Activity or Competing Business. CFLP explained why it has not sought to enjoin the data enhancement deals in its reply brief: "Those arrangements began prior or to the formation of CFLP and prior to the

---

as additional evidence tending to support the substantive provisions.

36. There is one exception to this general statement, however; section 11.04(c) sets forth definitions of Competitive Activity and Competing Business that apply to any section of the document.

37. The former limited partner may, however, receive additional amounts under section 11.04 for

the time period before the Competitive Activities began. Limited Partnership Agreement § 11.02(d).

38. *The NTC Group, Inc. v. West Point–Pepperell, Inc.*, Del. Ch., C.A. No. 10665, 1990 WL 143842 at *5, Hartnett, V.C. (Oct. 17, 1990) (citations omitted).

[1993] amendments to the [Limited] Partnership Agreement that included the express non-compete provisions." [39] It also appears that MDC's data enhancement deals generate revenues for CFLP as well as MDC.

The instant action, however, concerns only MDC's software distribution line of business. I have examined, as closely as the limited record will permit, MDC's history of developing software for CFLP's competitors. All of these transactions are not relevant, however. I find it most appropriate to focus on MDC's development of computer software for use by CFLP's competitors in the precise areas in which those rivals compete with CFLP. Those transactions provide the closest analogy to the transaction at issue in the instant action.

In this case, MDC helped CBB to create fully-interactive, electronic trading software for the brokerage of U.S. Treasuries. CFLP also brokers U.S. Treasuries, but it does not yet have a fully-interactive, electronic system. Thus, MDC has helped a CFLP competitor to obtain a potentially significant "edge" in the business of brokering U.S. Treasuries. MDC may also have aided the solicitation of CFLP's customers in order to convince them to make all of their future purchases and sales of U.S. Treasuries through the MarketPower system instead of through CFLP. These actions squarely fit the definition of a Competitive Activity and a Competing Business.

Defendants contend that MDC has, without objection from CFLP, engaged in other deals, precisely like the CBB deal, in the past and that, therefore, CFLP should be estopped from enforcing sections 3.03(a) and (b) of the 1996 Agreement now. For example, MDC explains that it created a system that allowed Cowen & Co., which was and is [40] CFLP's competitor in the mortgage-backed securities market, to trade mortgage-backed securities electronically. What is not clear is whether or not CFLP was able to trade mortgage-backed securities electronically at the time of the Cowen & Co. transaction. If CFLP did not have that capability, MDC would have conferred the identical competitive edge on a CFLP competitor that it conferred on CBB. This transaction, however, was completed before 1993, the year the pertinent language was added to the Limited Partnership Agreement.[41]

Similarly, MDC explains that it created a system that allowed InterCapital Debt Trading, Ltd., which at the time competed with CFLP in the emerging market field, to trade emerging market debt electronically, another transaction that would seem to constitute a Competitive Activity or a Competing Business. Again, it is not clear whether or not CFLP also had this capability at the time. This transaction was completed in late 1993, after CFLP added the pertinent provisions to the Limited Partnership Agreement. Defendants also contend that MDC proposed or negotiated, without objection from CFLP, additional transactions, similar to the MDC/CBB transaction, that were never completed. Defendants argue that by failing to object to the Cowen & Co., InterCapital, and various other uncompleted transactions as Competitive Activities or Competing Businesses under the 1996 Agreement, CFLP acquiesced in Defendants' competition with CFLP and created the impression that the CBB transaction also would not constitute a breach of fiduciary duty. The current record is wholly insufficient to address this point at this time.

Plaintiff contends that MDC has never pursued any of its software distribution deals independently, but that MDC has always sought permission from CFLP. Plaintiff further claims that it has denied MDC permission to build trading systems for at least three companies, where those systems would have allowed the companies to compete directly with CFLP.[42] Plaintiff contends that

---

**39.** Plaintiff's Reply Brief in Support of its Motion for Preliminary Injunction at 38.

**40.** Patriot Securities is the successor to Cowen & Co.

**41.** The arrangement, however, may have been renewed after 1993 with Cowen's successor, Patriot Securities.

**42.** The companies (and their areas of competition with CFLP) are Winstar (government securities), Fundamental Brokers, Inc. (Treasuries), and Daiwa (emerging markets).

it allowed the Cowen & Co. deal to go forward because that deal was completed before the 1993 amendments to the Limited Partnership Agreement and because Cowen & Co. competed with CFLP only in the mortgage-backed securities market, an area of very little or no profitability for CFLP.

■■■■■ Plaintiff concedes that it permitted the InterCapital deal to go forward,[43] although that deal was consummated after the 1993 amendments to the Limited Partnership Agreement. Nevertheless, Plaintiff argues that I can find no acquiescence on Plaintiff's part as a matter of law because the 1996 Agreement contains an express non-waiver provision.[44] Section 20.09 of the 1996 Agreement states:

> "No provision of this Agreement shall be deemed to have been waived unless such waiver is in writing signed by the waiving party. No such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given."

Thus, Plaintiff contends that CFLP could not have implicitly waived its rights by its failure to object to the InterCapital deal or any of MDC's other business dealings.[45] The acquiescence/waiver arguments go to the merits and are factually intensive. They cannot be finally resolved at this stage in the proceedings, on the limited record before me. It does appear, however, that Plaintiff has a reasonable likelihood of success on this issue.

■■■■■ Counts II and IV raise accomplice liability theories against MDC and CBB. Count II is a claim for aiding and abetting the Limited Partner Defendants' breach of fiduciary duty, and Count IV is a claim for tortiously interfering with the 1996 Limited Partnership Agreement. The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in the breach by the non-fiduciary defendant.[46] The elements of tortious interference are: (1) a contract, (2) defendant's knowledge of the contract, (3) an intentional act that is a significant factor in causing the breach of the contract, (4) lack of justification and (5) injury.[47]

A common basis for disposing of accomplice liability theories is that Plaintiff has not proved the underlying claim for principal liability. As I have explained, however, Plaintiff has shown that it is reasonably likely to succeed on the merits of its breach of fiduciary duty and breach of contract claims. Nevertheless, MDC and CBB contend that Plaintiff is not likely to succeed on the merits of its aiding and abetting and tortious interference claims because it cannot prove the elements of knowing participation or of intentional action without justification.[48]

It is undisputed that MDC and CBB agreed to work together to develop and sell a product that would compete directly with CFLP in what CFLP alleges is its core business: brokering U.S. Treasuries. The product is operable and is set to launch in July of 1998. CBB admits that it has been

43. Defendants argue that they were not required to obtain CFLP's "permission," but rather that CFLP "did not object" to the InterCapital deal.

44. "[A]cquiescence is a species of waiver." *Frank v. Wilson & Co.*, 9 A.2d 82, 87 (1939), *aff'd*, 32 A.2d 277 (1943). *See also Realty Growth Invs. v. Council of Unit Owners*, 453 A.2d 450, 456 n. 6 (1982)("As we see it, acquiescence and waiver both go to the extent of any inference which can be reasonably drawn from [plaintiffs'] conduct.").

45. *Marta v. Mutual Life Ins. Co.*, 887 F.Supp. 722, 727 (D.Del.1995).

46. *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.*, Del. Ch., C.A. No. 13950, 1995 WL 694397 at *15, Allen, C. (1995).

47. *See CPM Indus. v. Fayda Chems. & Minerals, Inc.*, Del. Ch., C.A. No. 15996, 1997 WL 770683 at *7, Jacobs, V.C. (Nov. 26, 1997).

48. On the final day of the preliminary injunction hearing, July 10, 1998, CBB cited the very recent case of my esteemed colleague, Vice Chancellor Jacobs, as definitively establishing there is no merit as a matter of law to these claims. I find that case, clear in its reasoning on its own facts, wholly inapposite here. *See In Re Frederick's of Hollywood, Inc. Shareholders Litig.*, Del. Ch., C.A. No. 15944, Jacobs, V.C., 1998 WL 398244 (July 9, 1998) mem. op.

actively soliciting customers, including CFLP's customers, to use MarketPower. While MDC denies direct participation in the marketing effort, it has known since October 6, 1997, that in Plaintiff's opinion, developing this product constituted a breach of the Limited Partner Defendants' duty of loyalty found in the Limited Partnership Agreement. CBB admits that MDC shared this information with CBB, and Rutter testified this occurred in October of 1997.[49] It is clear, however, that CBB knew of Plaintiff's objections at least by February 9, 1998, the date that CBB and MDC signed the CBB/MDC Software Licensing Agreement in which MDC agreed to indemnify CBB in the event that Plaintiff should obtain "against MDC any final and unappealable permanent injunction, court order or settlement of any litigation...."[50]

 Under these circumstances, I find that Plaintiff is reasonably likely to succeed on the merits of its accomplice liability claims. It is undisputed that MDC and CBB knew of Plaintiff's allegations. Thus, MDC and CBB had reason to believe that developing and marketing MarketPower *may* constitute a breach of the Limited Partner Defendants' duty of loyalty found in the 1996 Limited Partnership Agreement or tortious interference with that contract. MDC argues that it made its own investigation and determined that Plaintiff's interpretation was wrong, and CBB contends it relied on MDC's evaluation. This scenario does not fall within any "good faith negotiation at arm's length" safe harbor recognized under Delaware law.[51] In my opinion, there is a reasonable likelihood that Plaintiff will prove at the final hearing that its interpretation is correct. If that is the case, it is reasonable to further infer that MDC's and CBB's continued development and market-ing of MarketPower in the face of their knowledge satisfies the elements of knowing participation or intentional action without justification.

 MDC and CBB also contend that Plaintiff is not reasonably likely to succeed on the merits of Count V, a claim for unjust enrichment. Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[52] The elements of unjust enrichment have also been stated in this way: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law.[53] Unjust enrichment appears to be the underpinning for Plaintiff's claim for imposition of a constructive trust over the net proceeds garnered by both CBB and MDC from the MarketPower venture. CBB and MDC contend that any enrichment they may receive from MarketPower would neither violate "the fundamental principles of justice or equity and good conscience" nor be "unjustly retained." They will undoubtedly oppose the imposition of a constructive trust after a final merits hearing on the basis that the conduct of Cantor and Fisher did not rise to the level of unfair or unconscionable acts given their good faith interpretation of the Limited Partnership Agreement.

 It seems clear that the launch of MarketPower has the potential to enrich Defendants and to harm Plaintiff. If Plaintiff succeeds on the merits of its breach of fiduciary duty and contract interpretation claims (and I have already explained that Plaintiff is reasonably likely to do so), it is equally likely that it will also be able to prove that neither

---

**49.** Cross Examination of David E. Rutter, Transcript Vol. III at 626 (July 8, 1998). However, I cannot discern with precision the earliest date upon which CBB received this information.

**50.** Agreement Between Chicago Board Brokerage, L.L.C., and Market Data Corporation §§ 2.9, 8.3, 11.3.

**51.** *See In Re Frederick's of Hollywood, Inc. Shareholders Litig.*, Del. Ch., C.A. No. 15944, Jacobs, V.C., 1998 WL 398244 (July 9, 1998) mem. op. at 7 n. 8.

**52.** *Fleer Corp. v. Topps Chewing Gum, Inc.*, Del. Supr., 539 A.2d 1060, 1062 (1988).

**53.** *Khoury Factory Outlets, Inc. v. Snyder*, Del. Ch., C.A. No. 11,568, 1996 WL 74725 at *11, Kiger, M. (Jan. 8, 1996).

MDC nor CBB can retain any benefit resulting from the success of MarketPower "justifiably" or in accordance with "the fundamental principles of justice or equity and good conscience," because they knew that Cantor, Fisher, and CFI were prohibited from producing and marketing a product that would compete with Plaintiff. Thus, I find that Plaintiff is also reasonably likely to be successful on the merits of its unjust enrichment claim against CBB and MDC.

## B. Imminent, Irreparable Injury

 Plaintiff must also establish that I must preliminarily enjoin Defendants or Plaintiff will suffer immediate, discernible harm for which there is no adequate remedy at law. Stated another way, this extraordinary form of equitable relief should not be granted if the injury to Plaintiff is merely speculative[54] or if the injury can be fully compensated after a full trial on the merits, either by an award of damages or by any other form of final equitable relief.[55] Preliminary injunctive relief may be appropriate when Plaintiff's damages are difficult or impossible to quantify.[56]

 Despite my conclusion that Plaintiff seems reasonably likely to succeed on the merits of its claim of wrongful conduct by its limited partners, I cannot conclude my level of confidence on that point overcomes my judgment that the record simply does not support imminent, non-speculative damages that can be stemmed only by *preliminary injunctive* relief. I find myself, in this my own short "window of opportunity" to decide this complex matter, convinced that CFLP's and Howard Lutnick's ("Lutnick")[57] actions, more than uncontrollable market forces, will determine both the scope and nature of any

damage CFLP will suffer between now and the final hearing.

CFLP suggests it *must* lower commissions to meet the imminent threat of MDC's and CBB's wrongful competition in order to maintain market share, which will result in lower earnings, partners' dissatisfaction and diminished capitalization options—and all at once, within a critical time period. CFLP maintains the record is unassailable on this point. While it is understandably difficult to disagree that no testimony directly refutes Lutnick's declaration that CFLP *will have to* lower commissions and that lower commissions may be, in his view, the best and only immediate action able to protect market share, I do not find his testimony to be credible, at least as it applies to the time frame between July 13, 1998, and a final hearing. The record supports a conclusion that MarketPower has attracted only one primary dealer and six other contract customers and that CBB had placed only twenty-eight screens to date. In addition, under the most optimistic factual scenario, CBB would acquire a modest 1 percent market share by the end of 1998. There is no compelling evidence that the 1 percent share will be at the expense of CFLP as opposed to another broker or brokers. MarketPower seems unlikely to attract the primary dealers with whom CFLP does a substantial amount of its core business because their economic interests are also threatened by the featured "democratization" inherent in CBB's new trading system. Finally, commission costs are not the most important factor in a trade and, in fact, pale into insignificance next to the need for speed, the availability of liquidity and pricing opportunities and the presence of live brokers, who can serve as a source of quick, reliable information and as a hedge against falling victim to an innocent trading mistake.[58]

54. *See, e.g., USACafes v. Office,* Del. Ch., C.A. No. 8186, 1985 WL 44685 at *4, Berger, V.C. (Oct. 28, 1985).

55. *City Capital Assocs., L.P. v. Interco, Inc.,* 551 A.2d 787, 795 (1988) (Injunctive relief is proper if plaintiff can show "the threat of an injury that will occur before trial which is not remediable by an award of damages or the later shaping of equitable relief.").

56. *Commonwealth Assocs. v. Providence Health Care, Inc.,* Del. Ch., C.A. No. 13135, 1993 WL 432779 at *9, Allen, C. (Oct. 22, 1993); *Sealy Mattress Co. v. Sealy, Inc.,* 532 A.2d 1324, 1341 (1987); *In re Anderson Clayton Shareholders' Litig.,* 519 A.2d 669, 676 (1986).

57. Lutnick is the President and CEO of CFLP.

58. Cross Examination of Walter James Kenney, Transcript Vol. IV at 812 (July 9, 1998).

Although Lutnick clearly testified that he would *have* to cut commissions *immediately* to meet the threat of CBB's promised reduction to 2/3 of CFLP's commission costs, I do not find that statement credible. My impression is that CFLP is much too shrewd a business player in this market to "knee-jerk" a price cut until it carefully assesses CBB's actual, immediate, as well as its potential, long-term, impact. This is particularly true because it appears that all dealing in Treasuries is conducted on a non-exclusive basis, and CFLP's own September launch of its interactive, electronic trading system, offered as a choice or alternative to broker-assisted trading, has the potential to win back any business initially lost to MarketPower. Its impending launch and potential advantages may well cause current customers to adopt a wait-and-see approach before rushing headlong into the arms of CBB and MarketPower.

Whether I consider the imminent nature of CFLP's perceived threat from CBB as a separate element for analysis or as one combined with the irreparable injury that might result from that threat, the conclusion that CFLP would have me reach remains illusory. If the threat is real and imminent, it may still not result in any injury at all beyond CFLP's imagined loss of market share and the loss of revenues that could result from CFLP's voluntary decision to cut commissions. The MarketPower launch date of July 31, 1998, is certainly imminent and *may* constitute a threat that can be aggravated by CFLP's own precipitous reaction; but, I conclude the notion of actual, irreparable damage from that perceived threat to be speculative at best and illusory at worst.

I focus on CFLP's ability to exercise reasoned business judgment before deciding to lower commissions because I believe the record reflects that that decision would drive the entire equation for evaluating partners' reactions, sources of capitalization, significant revenue impact and protection of market share. I, nonetheless, do not overlook the

fact that market share and those very revenues *may be* impacted by the innovations of MarketPower, which include increased transaction speed, rapid confirmation and user-friendly screens. No doubt the Chicago Board of Trade's clearing facilities will be available to some, if not all, of CBB's customers for the advantages that derive from cross-margining, discussed at length at the hearing. Those advantages CBB believes it brings to the market, and can enhance by being first in the market, however, may not, in fact, have the expected appeal in either the short or long term. I cannot, therefore, believe CFLP will self-destruct by improvidently reducing commissions to create immediate, irreparable harm to meet a threatening competitor who may, in fact, be no more than a paper tiger. I do know that the record in this hearing does not support the requisite finding of immediate, irreparable injury required for the extraordinary relief of a preliminary injunction.

I conclude Plaintiff has not established the second requisite element upon which preliminary injunctive relief is predicated.

### C. Balance of the Equities

■■■■ "[A] court of equity has discretion to grant or deny an application for injunctive relief in light of the relative hardships of the parties."[59] Thus, in order to obtain preliminary injunctive relief, Plaintiff must prove that this Court's failure to grant the injunction will cause Plaintiff greater harm than granting the injunction will cause Defendants. It is also appropriate to consider the impact an injunction will have on the public and on innocent third parties.[60]

I address the issue of the balance of the equities for two reasons even though I have already found Plaintiff unpersuasive on the element of an imminent threat of irreparable injury. First, I believe that this court of equity must look carefully at any accusation that a fiduciary has breached his or her duty of loyalty to a partner and has engaged in

**59.** *Bernard Personnel Consultants, Inc. v. Mazarella,* Del. Ch., C.A. No. 11660, 1990 WL 124969 at *2, Allen, C. (Aug. 28, 1990)(citing *Richard Paul, Inc. v. Union Improvement Co.,* 91 A.2d 49, 54).

**60.** *City Capital,* 551 A.2d at 795; *Newell Co. v. Wm. E. Wright Co.,* 500 A.2d 974, 975 (1985).

wrongful competition that harms his or her partners. Second, I view this case as one in which the public interest, and that of innocent third parties, may be seriously impacted by an improvident restriction of an attempt to broaden the basis of participation in an important national market. The tension between those interests and how they play out in the coming months have an impact on more business entities and individuals than the parties to this litigation. Therefore, I believe it is appropriate to explain my view of these equities supported by the record and their short-term relative importance. These views *may* be of benefit to the parties as they assess their business risks in relation to further legal proceedings as they progress *toward integrating their respective versions* of interactive, electronic trading into the marketplace. The more persuasive elements of the equities equation are as follows:

- Plaintiff's delay in bringing suit between the time of its initial discovery of its partners' actions through MDC and the date of filing this action induced Defendants to move forward with their business plan to their potential detriment and put them in a position of *greater risk.* I note, however, that the analysis of delay for the purpose of balancing the equities on an application for a preliminary injunction is not the equivalent of a determination that Defendants have unreasonably delayed in bringing an action resulting in prejudice sufficient to establish the affirmative defense of laches.

- If injunctive relief is granted, CBB will lose its parents' funding, and no matter how questionable a court may view that judgment to stop funding, CBB will cease to exist.[61]

- Although 98 percent of MDC's current business is data enhancement and distribution, with contracts in place until 2003 and 2006, with Reuters and Telerate, respectively, MDC will lose any meaningful opportunity to develop its technology business because its ability to operate independently of CFLP will

be suspect. With the looming spectre of being drawn into litigation by CFLP, prospective customers will shy away from doing business with MDC. MDC's future expansion of its more-promising technology division, and its employees' willingness to incur that risk, is problematic.

- Within the short period of time between the launch of MarketPower and the final hearing on the merits, there is no rational basis to conclude CFLP will actually cut commissions, given the irrevocable consequence, historically, of similar actions, in order to meet the speculative threat of CBB who currently has only seven contract customers, only one of which is a primary dealer, and with only twenty-eight screens currently in place.

- Under the most optimistic of realistic scenarios, CBB will be able, *by the end of 1998,* to capture only 1 percent of market share. No one can actually predict from what section of the broader market or at whose expense that 1 percent will come—from CFLP or from other brokers. The speculative nature of the perceived clout of CBB's parents, the advantages of cross-margining opportunities and user-friendly screens hardly offset the immediate economic realities.

- MarketPower seems unlikely to attract the primary dealers with whom CFLP does most of its core business because their economic interests are also threatened by the "democratization" of trading promised by CBB, its parents and CFLP.

- Within sixty days after the MarketPower launch, CFLP expects to launch its own interactive, electronic trading system and will be linked with the New York Cotton Exchange and its clearing facilities in an effort to provide a cross-margining option to its customers. I note, however, that the link with the New York Cotton Exchange is depen-

---

61. *See* Direct Examination of David E. Rutter, Transcript Vol. III at 556, 557 (July 8, 1998).

*See* Deposition of Patrick H. Arbor at 172 (June 30, 1998).

dent upon approval from the Commodity Futures Trading Commission.

• When one recognizes that commission costs are only one, and even then not the single most, important factor in choosing a broker, CFLP will shortly have combined the following potent trading advantages, which strengthen its market position:

a) enhanced speed of transaction and confirmation;

b) broad liquidity and pricing opportunities;

c) a "live broker" alternative to interactive, electronic, "fat-fingered" trading, including a source of quick, reliable information and a hedge against falling victim to an innocent trading mistake;

d) a *de facto* economic alliance with primary dealers; and

e) a worldwide presence and reputation for being the place to do business, especially for benchmark issues and high-volume trades.

• The public has an interest in competitive trading and in the introduction of innovative efficiencies into the marketplace. The interplay of the efforts of these parties over the following months until their legal dispute can be resolved on the merits may serve the public interest.

A fair and objective analysis of the many issues all parties have brought to bear on the interim balancing of the equities requires that I conclude that issuing a preliminary injunction would cause more harm to Defendants, their employees and the public than the harm caused to Plaintiff by denying its application.

## CONCLUSION

Plaintiff's Motion for a Preliminary Injunction is *denied.*