**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| IN RE: THE MATTER OF THE ESTATE OF ) <br> KENNETH R. WOLHAR ) <br>  ) <br> NATALIYA V. WOLHAR ) <br> Petitioner, ) <br> v. ) <br>  ) <br> CAROLYN WOLHAR, Executrix of the Estate ) <br> Of KENNETH R. WOLHAR, ) <br> Respondents. ) | C.A. No. 12860-MG |

**MASTER'S REPORT**

Date Submitted: January 12, 2018
Draft Report:
Final Report: February 6, 2018

Petitioner, Nataliya V. Wolhar (hereinafter "Nataliya"), surviving spouse of

Kenneth R. Wolhar (hereinafter "decedent"), filed this petition for an elective share

of the decedent's estate.[1]  Respondent, Carolyn Wolhar (hereinafter "Carolyn"),

executrix of decedent's estate, filed an answer and counterclaim asserting that

Nataliya and decedent executed pre-nuptial and post-nuptial agreements in which

Nataliya waived her right to take an elective share against decedent's estate or to

claim a spousal allowance.[2]  Carolyn seeks a declaratory judgment denying

---

[1] I may use first names in pursuit of clarity and intend no familiarity or disrespect.
[2] Nataliya had previously filed a request for a spousal allowance with the Register of Wills on October 14, 2016.

Nataliya's claim for an elective share, precluding her from receiving a spousal allowance from the decedent's estate, and providing that Nataliya is only entitled to the $5,000 bequest provided for in the decedent's will, and attorney's fees.

Pending before me are Nataliya's motions for a preliminary injunction and a protective order, and to quash subpoenas; motions to quash a subpoena and for a protective order filed by Veta McCarther (hereinafter "McCarther"), a third party; and Carolyn's motion to compel the production of documents under the subpoena to McCarther, along with her request for attorney's fees incurred related to these discovery disputes.

I recommend that the Court deny Nataliya's motion for a preliminary injunction, and the discovery motions filed by Nataliya and McCarther. I also recommend that the Court decline to grant Carolyn's motion to compel at this time, and reject Carolyn's request for attorney's fees. This is a final report.

## BACKGROUND

The factual background has not been fully developed at this point. It appears that Nataliya, who is from Ukraine, and decedent, a Delawarean, met while decedent was on a trip to Ukraine in May 2007, and became engaged around December 2007, with decedent taking steps following their engagement to obtain visas for Nataliya and her minor daughter to come to the United States. Nataliya and the decedent married in Kiev, Ukraine on May 27, 2010. They had previously executed a pre-

nuptial agreement, with the decedent signing the English version of the agreement in Delaware on or about March 1, 2010, and Nataliya executing the agreement, which had been translated into Ukrainian, in both English and Ukrainian, on or about April 20, 2010, in the presence of a Ukrainian attorney. Section 2 of the pre-nuptial agreement states:

> 2. Release of Marital Rights by Nataliya Ohorodnychuk.
> Nataliya Ohorodnychuk hereby waives and releases all statutory or common law rights which she may have as a spouse or surviving spouse in the property (including the home derived there from) or estate of Kenneth Wolhar, owned by him at the time of the marriage or acquired by him at any time thereafter, under the present laws of the State of Delaware or any amendments or supplements thereto and under the same or similar laws of any other jurisdiction including, without limitation:
> (a) The right to elect to take against the provisions of any will of Kenneth Wolhar, whether heretofore or hereafter made;
> (b) The right to take a distributive share in the event of Kenneth Wolhar's death in testate.
> (c) The right to share in Kenneth Wolhar's estate by way of courtesy, elective share, spouse's allowance or otherwise;
> (d) The right to be named as beneficiary of benefits payable under any pension benefit plan in which Kenneth Wolhar is a participant or former participant; and
> (e) The right to act as administrator of Kenneth Wolhar's estate.[3]

Section 23 of the agreement provides if the decedent "should die during the marriage a provision is provided in the will for Nataliya."[4]

---

[3] Resp't's Answering Br. in Opp'n to Pet'r's Mot. for Prelim. Inj., Exh. C, § 2 (Nov. 2, 2017).
[4] *Id.*, Exh. C, § 23.

After a lengthy process to obtain visas for Nataliya and her daughter, it appears that they received the necessary visas in May 2011, and moved to Newark, Delaware with the decedent sometime between May 2011 and August 12, 2012. The parties also executed a post-nuptial agreement in August 2012 in Delaware, which contained the same substantive provisions as the pre-nuptial agreement, including the waiver of marital rights. The decedent executed his Last Will and Testament on April 12, 2012, in which he bequeathed $5,000 to Nataliya and $1,500 to Nataliya's daughter, among a few other specific bequests, and named his sisters, Carolyn and Shirley Wolhar, as the main beneficiaries and Carolyn as executrix of the estate. The decedent died on May 11, 2016.

Nataliya, acting *pro se*, filed a petition for an elective share of the decedent's estate in this Court on October 28, 2016. Nataliya also filed a petition to set aside pre-nuptial and post-nuptial agreements in Family Court on December 21, 2016. Carolyn filed an answer and counterclaim to Nataliya's petition in this Court, and a motion to dismiss Nataliya's Family Court petition for lack of jurisdiction. On March 7, 2017, the Family Court granted Carolyn's motion and dismissed Nataliya's petition, finding the action seeks to determine the distribution of assets from the decedent's estate and the Court of Chancery is the proper forum to exercise jurisdiction over this matter.[5] Following the proceedings in Family Court and other

_____

[5] *N.W. v. C.W.,* 2017 WL 1294826, at *3 (Del. Fam. Mar. 7, 2017).

motions that are unnecessary to review here, Nataliya filed her answer to Carolyn's counterclaim and an amended complaint.

On September 28, 2017, Nataliya filed a motion for a preliminary injunction,[6] and Carolyn responded that Nataliya has not met the required elements for preliminary injunctive relief.[7] The motion for a preliminary injunction is fully briefed.

In November 2017, discovery disputes began to arise between the parties related to subpoenas issued by Carolyn to persons or entities that are not parties to this action. On November 7, 2017, Nataliya filed a motion to quash Carolyn's subpoena issued to Main Street Court LLC on October 25, 2017, claiming that the documents sought (related to Nataliya's apartment lease) are irrelevant to this action. Carolyn responded that Nataliya has no standing to move to quash the subpoena issued to a third party.

On December 5, 2017, McCarther, a third party, filed a motion to quash the subpoena issued to her by Carolyn claiming it was not properly served on her. Carolyn responded in a letter dated December 21, 2017, that, rather than filing a response opposing the motion to quash, a subpoena was reissued to McCarther on December 13, 2017, making McCarther's motion to quash moot.

---

[6] Nataliya did not request that the preliminary injunction be treated on an expedited basis.
[7] Resp't's Answering Br. in Opp'n to Pet'r's Mot. for Prelim. Inj., 35 (Nov. 2, 2017).

On December 22, 2017, Nataliya filed a motion to quash the subpoena issued to McCarther and asked the Court to prohibit Carolyn from conducting "further third party discovery on absolutely non-related matters."[8]  On December 28, 2017, Carolyn responded that Nataliya's motions to quash and for a protective order should be denied because Nataliya has no standing to quash subpoenas issued to a third party, and communications sought by the subpoena are relevant and reasonably calculated to lead to discovery of admissible evidence.  She also sought attorney's fees under Court of Chancery Rules 26(c) and 37(a)(4).  Nataliya's January 12, 2018 reply argued that the McCarther subpoena would not produce relevant evidence, was issued in bad faith and unreasonably cumulative, and imposes an undue burden.

On December 26, 2017, McCarther filed a motion for a protective order, claiming that the subpoena served on her on December 13, 2017 was issued in bad faith, sought her private communications with Nataliya which are not relevant to the issue in this case, and was being used for intimidation and personal revenge. Carolyn's December 28, 2017 response sought denial of McCarther's motion for a protective order and to compel McCarther to comply with the subpoena, as well as attorney's fees under Court of Chancery Rules 26(c) and 37(a)(4).  Briefing is complete on the parties' current discovery motions.

---

[8] Pet'r's Mot. to Quash Resp't's Subpoena Issued to McCarther, 4 (Dec. 22, 2017).

## ANALYSIS

### 1. PRELIMINARY INJUNCTIVE RELIEF

#### A. Standard of Review

To obtain a preliminary injunction, the movant must demonstrate: (1) a reasonable likelihood of success on the merits at a final hearing; (2) an imminent threat of irreparable harm; and (3) a balancing of the equities that tips in favor of issuance of the requested relief.[9] Some showing is required for each element but the elements "are not necessarily weighted equally," because "a strong showing on one element may overcome a marginal demonstration of another."[10]

Nataliya's motion for a preliminary injunction seeks the following relief: Carolyn deposit one-third of the estate (or $829,960.67 in Nataliya's estimation) into an escrow account; post bond; file lis pendens; and provide to Nataliya a Form 706 tax return to facilitate elective share calculations.[11]

#### B. Reasonable Probability of Success

To determine if a party seeking a preliminary injunction has a reasonable likelihood of success on the merits, the Court considers all of the evidence currently in the record and decides if it is reasonably likely that the movant will establish the

---

[9] *Cf. Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998); *N.K.S. Distributors, Inc. v. Tigani*, 2010 WL 2367669, at *3 (Del. Ch. June 7, 2010).

[10] *Cantor,* 724 A.2d at 579; *cf. Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *3 (Del. Ch. Nov. 5, 2004).

[11] Pet'r's Br. in Supp. of Pet'r's Mot. for Prelim. Inj., 8 (Sept. 28, 2017).

necessary facts by a preponderance of the evidence.[12]  Nataliya claims she is likely to succeed on the merits because the pre- and post-nuptial agreements were unconscionable and not voluntarily entered into.  Carolyn asserts Nataliya has not shown that she is reasonably likely to succeed on the merits because she has not demonstrated the elements necessary to overturn the pre- and post-nuptial agreements to allow her to take an elective share of the decedent's estate.  The critical issue in determining whether Nataliya may take an elective share under 12 *Del. C.* § 901, and a spousal allowance under 12 *Del. C.* § 2308, is whether she waived her surviving spouse rights as authorized by 12 *Del. C.* § 905 through her execution of the pre- and post-nuptial agreements.  Since Family Court has extensive experience in determining the enforceability of pre-nuptial agreements, I look to that Court's decisions for guidance on the interpretation of the statutory provision governing enforcement of pre-marital agreements, 13 *Del. C.* § 326.  For marital agreements, "public interest requires that a financial agreement among spouses or prospective spouses be executed under conditions of candor and fairness," since they "stand in a confidential relationship."[13]  The enforceability of a pre-nuptial

---

[12] *Cantor,* 724 A.2d at 579.
[13] *Coulbourn v. Lambert*, 1996 WL 860586, at *7 (Del. Fam. Dec. 19, 1996)(citing *Button v. Button*, 388 N.W.2d 546, 550 (Wis. 1986)).

agreement is determined by a court based upon a case-by-case fact-specific analysis.[14]

Section 326 of title 13 of the Delaware Code provides that the enforceability of a pre-marital agreement turns on:  1) whether the agreement was entered into voluntarily; 2) the agreement was unconscionable at the time it was executed; 3) whether, prior to execution of the agreement, the party seeking enforcement of the agreement provided fair and reasonable disclosure of their property and financial obligations; and 4) the party trying to set aside the agreement did not voluntarily and expressly waive their rights to additional disclosure in writing, and did not have, or reasonably could not have had, adequate knowledge of the other party's property and obligations.  The spouse seeking to set aside the pre-marital agreement has the burden of proving a basis for non-enforcement under section 326.  However, if the other spouse is found to be the dominant party in the relationship, then the burden shifts to them to prove the fairness of the agreement.[15]

---

[14] *A.E.S. v. S.N.S.*, 2006 WL 2389314, at *2 (Del. Fam. May 9, 2006) ("an assessment of voluntariness is extremely fact-sensitive, and can be made only by analyzing all of the relevant circumstances surrounding the execution of a pre-nuptial agreement").

[15] *Cf. L.W. v. J.J.W.*, 2014 WL 4203848, at *6 (Del. Fam. June 27, 2014); *A.E.S. v. S.N.S.*, 2006 WL 2389308, at *6 (Del. Fam. Apr. 4, 2006); *J.A.B. v. N.H.B.,* 2003 WL 23312951, at *4 (Del. Fam. Nov. 18, 2003).

Courts analyze pre-nuptial agreements for procedural and substantive fairness, consistent with section 326.[16] Caselaw indicates that the decision whether to set aside pre-nuptial agreements focuses on voluntariness and adequate disclosure of the spouse's financial circumstances to determine whether each spouse had "meaningful choice."[17] Courts look at factors such as whether each party had independent counsel, had adequate time to review the agreement, understood the terms of the agreement and their effect, understood their financial rights in the absence of the agreement, adequately disclosed financial assets and obligations prior to execution of the agreement, as well as other influences, including the time frame during which the agreement was negotiated, the timing of its negotiation and execution as compared to the couple's wedding date, and the disparity in bargaining power between the spouses.[18]

When determining substantive fairness, or unconscionability, courts consider factors such as the "objectives of the parties in executing the agreement, the economic circumstances of the parties, the property brought to the marriage by each party, each spouse's family relationships and obligations to persons other than the spouse, the earning capacity of each person, the anticipated contribution by one party

---

[16] Although § 326 does not specifically apply to post-nuptial agreements, the factors considered to determine enforceability of pre-nuptial agreements would also apply to post-nuptial agreements since the major difference in those agreements is when, during the course of the parties' relationship, the agreement is entered into.

[17] *A.E.S.,* 2006 WL 2389314, at *2 (citing *Button*, 388 N.W.2d at 551).

[18] *Cf. Id.* at *2-*4; *J.A.B.,* 2003 WL 23312951, at *6-*7; *Coulbourn*, 1996 WL 860586, at *9.

to the education, training or increased earning power of the other, the future needs of the respective spouses, the age and physical and emotional health of the parties, and the expected contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services."[19]  These factors are generally considered from the perspective of the parties at the time of the agreement.[20]

In this case, Nataliya alleges the pre- and post-nuptial agreements are invalid because they were based upon fraudulent misrepresentation; there was overreaching by the decedent, who was a dominant party and 31 years older than Nataliya, his wife; she had limited education and did not understand English or the legal concepts in the agreements; the translations of the agreements into Ukrainian were poor, resulting in incorrect translations of the legal terms and concepts such as "elective share" and "spousal allowance," which are concepts not recognized in Ukraine; the decedent failed to list all of his assets; she has been left destitute; she did not have the opportunity to review the agreements in any depth prior to executing them; and she did not receive good legal advice from the Ukrainian attorney who was unilaterally chosen by the decedent to represent her for the pre-nuptial agreement during their "five minute" meeting, nor from the attorney in Delaware who she met

---

[19] *Button*, 388 N.W.2d at 551.
[20] Although if circumstances have significantly changed after the agreement affecting the parties' reasonable expectations, then courts have looked at those circumstances, as well.  *Id.*

with related to the post-nuptial agreement for "five minutes" (with no interpreter present during that meeting).[21]

Carolyn argues that the pre-nuptial agreement was in compliance with 13 *Del.C.* § 323(a) and provided for a waiver of various marital rights, including the right to take an elective share and spousal allowance. It contained a proper and accurate disclosure of the decedent's financial assets,[22] and provided that, if the decedent died during the marriage, there was a provision for Nataliya in his will. Carolyn asserts Nataliya received the draft agreement in English and in Ukrainian (it had been translated by a Ukrainian based certified translation company) for review and comment in March 2010. She further claims Nataliya actively and voluntarily participated in the drafting process, selected the attorney to represent her and, after meeting with her Ukrainian attorney, executed the agreement in Kiev, Ukraine on or about April 20, 2010, approximately one month before the parties' marriage. Carolyn contends that Nataliya understood and communicated well in English at the time she executed the pre- and post-nuptial agreements, conversing exclusively with the decedent in English and choosing to conduct her

---

[21] Pet'r's Answer to Resp't's Countercl. (Mar. 6, 2017); Am. Compl. (Apr. 13, 2017).
[22] Nataliya argues that the decedent did not disclose his ownership in the Wolhar Investment Company, Inc.; in response, Carolyn claims that the only asset of that company is real property in Wilmington, Delaware that was disclosed in the pre-nuptial agreement. Resp't's Answer and Countercl. to 2nd Am. Compl., 16-17 (June 30, 2017). Also, Carolyn asserts that Nataliya failed to disclose her ownership interest in a $60,000 Ukrainian property in the pre-nuptial agreement. Resp't's Answering Br. in Opp'n to Pet'r's Mot. for Prelim. Inj., 11, n. 7.

visa application interview in English, and that Nataliya was represented separately by a Delaware attorney with ten years of experience when she executed the post-nuptial agreement. Carolyn further alleges that, during their six years of marriage, the parties acted in conformity with the agreements and it was not until after the decedent's death that Nataliya challenged the agreements.[23] She denies Nataliya's assertion that the decedent was the dominant party, arguing that Nataliya was 30 years old, previously married and divorced, raising a ten-year old daughter, and was "hardly a naïve party."[24]

Determinations whether pre- or post-nuptial agreements are enforceable are highly fact sensitive. Nataliya asserts that she did not enter into either agreement voluntarily and lacked an understanding of what she was giving up by waiving her marital rights in the pre- and post-nuptial agreements because she had limited English skills, the agreements were translated into Ukrainian poorly, the legal advice she received from her Ukrainian attorney was ineffective because there are not the same marital rights in Ukraine, decedent failed to list all of his financial assets in the agreement, she did not negotiate the agreements and only saw the agreements and met with her counsel, who were selected by the decedent, right before she signed the agreements, and was pressured into signing the agreements by the decedent, who

---

[23] Resp't's Answer and Countercl. to 2nd Am. Compl.
[24] Resp't's Answering Br. in Opp'n to Pet'r's Mot. for Prelim. Inj., 25.

was the dominant party in the relationship, and because of the upcoming wedding date.

Carolyn responds that Nataliya entered into the agreements voluntarily and that the decedent provided full financial disclosure with the agreements, and that she participated in the drafting of the agreement (provided an email showing that Nataliya discovered an error in a draft of the agreement), the agreement was translated by a certified translator into Ukrainian and that Nataliya understood English well when she entered into both agreements; Nataliya selected the Ukrainian attorney who represented her, met with her separately (not in the presence of the decedent) and had the opportunity to seek any guidance that she wished, and the Delaware attorney who represented her was experienced; the decedent, although older, was not dominant and Nataliya was not naïve, but 30 years old, divorced and a parent at the time of the marriage.

There is not sufficient evidence in the current record for me to find that there is a reasonable probability that Nataliya will succeed on the merits. Nataliya's assertions have been addressed, for the most part, through Carolyn's arguments. While Nataliya may ultimately succeed on the merits once the factual record is fully developed at trial, the current record sustains only a weak showing of Nataliya's likelihood of prevailing on the merits. Without a strong showing on the other two

factors necessary for a preliminary injunction, Nataliya's claim for preliminary injunctive relief fails.

## C. Imminent Threat of Irreparable Injury

"Irreparable harm generally exists where the injury cannot be adequately compensated in damages."[25]   Since a preliminary injunction is "an extraordinary form of equitable relief," if the injury is "merely speculative" or can be adequately compensated for by monetary damages after a trial on the merits, then preliminary injunctive relief should not be granted.[26]

Nataliya asserts there will be irreparable harm unless Carolyn is enjoined from dissipating the estate's assets that represent her elective share.  Carolyn argues that no imminent threat of harm has been demonstrated, since money damages would be sufficient to compensate Nataliya if it is determined that she should receive an elective share of the estate, and there are no reasonable grounds to believe that Carolyn, as executrix of the estate, will dissipate the assets jeopardizing Nataliya's share.  Carolyn stated that she is retaining real property of the estate with values that, when combined with estate funds being held in an attorney trust account, would be sufficient to satisfy any elective share payment.

---

[25] *Alpha Builders, Inc.*, 2004 WL 2694917, at *5.
[26] *Id.; see also Cantor*, 724 A.2d at 586.

Since an elective share can be satisfied "in cash or in kind, or partly in each"[27] monetary damages would be sufficient to compensate Nataliya if she ultimately is entitled to an elective share of the estate. Carolyn detailed the actions she has taken to set aside sufficient estate assets should it be determined that Nataliya takes an elective share. Nataliya has presented no evidence to support her claim that Carolyn will dissipate the estate assets necessary to cover an elective share. Carolyn, as executrix, has a fiduciary responsibility to properly administer the estate, including the payment of estate debts, such as the elective share. And, liability for the elective share is apportioned among the recipients of the decedent's contributing estate and Carolyn, as one of the two main beneficiaries of the estate under the decedent's will, would be liable for her proportionate share of that contribution.[28] Based on the current record, any asserted injury to Nataliya is speculative, and she has not shown she will suffer imminent, irreparable damages, which is necessary to support a grant of preliminary injunctive relief.

**D. Balancing of Hardships**

Nataliya also argues the balancing of the hardships weighs in her favor, or that the harm to her if the relief she requests is not granted (if Carolyn does not place

---

[27] 12 *Del. C.* § 901(a).
[28] 12 *Del. C.* § 908(a).

one-third of the estate's value into an escrow account,[29] post bond, file lis pendens, and give her a Form 706 tax return to facilitate elective share calculations), is greater than the injury to Carolyn if she is required to take those acts. Carolyn responds that balancing the equities weigh against Nataliya for purposes of a preliminary injunction, since monetary damages are adequate, she has no claim to specific real property because an elective share can be satisfied "in cash or in kind, or partly in each," and Nataliya was not left destitute as she had $17,000 provided to her in a bank account by the decedent at the time of the decedent's death.[30]

To obtain preliminary injunctive relief, Nataliya needs to prove that the failure to grant the injunction will cause her more harm than the injury that granting the injunction causes Carolyn. Nataliya argues that the burden on Carolyn to post a bond and place an amount equal to the value of the elective share into an escrow account will likely cause less harm than she will suffer if estate assets are dissipated prior to her receiving an elective share. However, Nataliya has presented no evidence that Carolyn is likely to violate her fiduciary duties as executrix by dissipating the estate assets that would be necessary to satisfy an elective share claim against the estate. And, Carolyn detailed specific estate assets, including three

---

[29] Nataliya calculates the elective share value as $829,960.67 and Carolyn estimates it at $599,879.93, reflecting reductions because the value of certain properties in the original inventory were too high as compared to actual appraisals or sale prices. Resp't's Answering Br. in Opp'n to Pet'r's Mot. for Prelim. Inj., 27-28.

[30] Resp't's Answering Br. in Opp'n to Pet'r's Mot. for Prelim. Inj., 33, Exh. O.

pieces of property, with combined values totaling approximately $437,500, and funds from the sale of another piece of property being held in an attorney trust account,[31] that have been set aside to satisfy an elective share, should one be granted by the Court.[32] The Court expects that these assets, or other estate assets sufficient to satisfy an elective share, should one be granted, will continue to be set aside during the pendency of the litigation, consistent with Carolyn's assurances to the Court. Further, Nataliya's request that Carolyn post bond contradicts the specific instructions of the decedent in his will.[33] With regard to Nataliya's request for a court-ordered lis pendens, a party asserting a claim in a court with civil jurisdiction has statutory authority to file a lis pendens with the office of the recorder of deeds in the county where the property is located, so the Court's involvement, at this point, is not needed.[34] Although the decision on whether this factor has been met is much closer than with the other factors, I do not find that the balancing of hardships, overall, weighs in Nataliya's favor to support the grant of preliminary injunctive relief.

---

[31] The specific property noted was 27 Sheffield Road, Rehoboth Beach, Delaware; the estimated value of that property included in the list of the decedent's assets contained in the pre- and post-nuptial agreements is $850,000. Resp't's Answering Br. in Opp'n to Pet'r's Mot. for Prelim. Inj., Exh. D, § 3, and Exh. G, § 3.

[32] Resp't's Answering Br. in Opp'n to Pet'r's Mot. for Prelim. Inj., 30-31.

[33] Decedent's will provides that the executrix should serve "without bond." *Id.,* 34, Exh. H.

[34] *See* 25 *Del. C.* § 1601.

## E. Conclusion

Accordingly, I recommend that the Court deny Nataliya's motion for a preliminary injunction because she has not met her burden of demonstrating a reasonable likelihood of success on the merits at a final hearing, an imminent threat of irreparable harm, and the balancing of the equities that tips in favor of issuance of the requested relief.

## 2. DISCOVERY DISPUTES

### A. Standard of Review

The scope of permissible discovery under Court of Chancery Rule 26(b)(1) is "broad and far-reaching."[35]  Rule 26(b)(1) provides:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party.... It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Accordingly, discovery must be tied to an issue presented in the litigation and reasonably calculated to lead to the discovery of admissible evidence.  It is an expansive standard that permits litigants to seek irrelevant information that is

---

[35] *Hamilton Partners, L.P. v. Highland Capital Mgmt., L.P.,* 2016 WL 612233, at \*2 (Del. Ch. Feb. 2, 2016)(citations omitted).

reasonably likely to uncover relevant information.[36] Evidence is relevant if it has "any tendency" to make the existence of a fact of consequence in the action more or less probable.[37] Limitations on the scope of discovery, in addition to privilege, are defined in Rule 26(b)(1) and include requests that are unreasonably cumulative or duplicative, or unduly burdensome or expensive, when all of the factors surrounding the case are considered. The burden is on the objecting party or person to show that discovery should be restrained.

Court of Chancery Rule 26 (c) authorizes the Court, upon motion by the party or person from whom discovery is sought, to issue a protective order, for good cause shown, preventing discovery or limiting the scope of discovery, to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Courts impose restrictions on discovery pursuant to Rule 26(c) only when "strong justification exists for such action."[38] For example, protection because of annoyance is applied only when annoyance reaches "extraordinary conditions," exceeding the "degree of annoyance that is present and inherent in any litigation."[39]

Rule 45 provides a "discovery tool for a party to request documents from a non-party."[40] Rule 45(c)(1) requires that the party or attorney issuing a subpoena

---

[36] *Id.*
[37] *E-S.S v. B-E.S*, 2013 WL 8374353, at *1 (Del. Fam. Sept. 10, 2013).
[38] *Taglialatela v. Galvin*, 2012 WL 6681871, at *1 (Del. Ch. Dec. 7, 2012)(citation omitted).
[39] *Id.*
[40] *Alberta Sec. Comm'n v. Ryckman*, 2015 WL 2265473, at *9 (Del. Super. May 5, 2015), *aff'd,* 127 A.3d 399 (Del. 2015).

"take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena." Rule 45(c)(2) authorizes the party serving the subpoena to move the court to compel the production of documents from a non-party, while Rule 45(c)(3)(A) permits the court, upon motion, to quash or modify a subpoena if it does not provide a reasonable time for compliance, seeks disclosure of privileged information, or imposes an undue burden.

## B. McCarther's Discovery Motions

Carolyn served a subpoena on McCarther on December 13, 2017 requesting that she produce copies of all communications and documents exchanged between her and Nataliya or Nataliya's daughter regarding

> the Estate of Kenneth R. Wolhar, Carolyn, Wolhar, or the subject matter of the above-captioned case in the Court of Chancery or a matter in the Family Court of Delaware in Case No. CN16-07080 captioned *Nataliya V. Wolhar f/k/a Nataliya V. Ohorodnychuk, Widow of Kenneth R. Wolhar v. Carolyn Wolhar, Executrix of the Estate of Kenneth R. Wolhar.*[41]

On December 26, 2017, McCarther filed a motion for a protective order under Court of Chancery Rule 26(c), against Carolyn's subpoena, arguing that the information sought is not relevant since under Delaware law (13 *Del. C.* § 326), the determination of whether a pre-marital agreement is unenforceable is based upon whether it was unconscionable when it was executed, and all of the communications

---

[41] Resp't's Resp. in Opp'n to McCarther's Mot. for Protective Order, ¶ 1, Exh. A (Dec. 28, 2017).

occurred after the execution of the pre- and post-nuptial agreements.[42]  As a result, McCarther contends the communications sought could not be reasonably calculated to lead to the discovery of admissible evidence and are not discoverable.  She further asserts that the subpoena is being used for intimidation and personal revenge by Carolyn's attorney, with whom McCarther is familiar because she worked at the same law firm with him previously.  She identified the service of the subpoena on her, first at her old job and then her new job, as support for her allegation of personal revenge.

On December 28, 2017, Carolyn filed a response to McCarther's motion for a protective order, and a cross-motion to compel McCarther to comply with the subpoena.  She also sought attorney's fees under Court of Chancery Rules 26(c) and 37(a)(4).  Carolyn agrees that her counsel worked with McCarther, who is a paralegal, at a Delaware law firm from August 2007 until February 2015, but asserts Carolyn's counsel and McCarther have always maintained a cordial and professional relationship and that McCarther has provided no evidence supporting her allegations that the subpoena is a personal vendetta to shame her or weaken her job reputation.  Carolyn alleges McCarther's communications with Nataliya or her daughter may

---

[42] On December 5, 2017, McCarther moved to quash the subpoena issued to her by Carolyn for improper service.  Carolyn responded, in a letter dated December 21, 2017 that, rather than filing a response opposing the motion to quash, a subpoena was reissued to McCarther on December 13, 2017, making McCarther's motion to quash moot.  Given the factual circumstances, I find McCarther's December 5, 2017 motion to squash is moot and do not address it further.

provide information concerning the circumstances surrounding the pre- and post-nuptial agreements, because McCarther attempted to find Nataliya a lawyer related to this litigation and Carolyn's counsel had contacted McCarther about translating the Ukrainian version of the nuptial agreements.[43]

McCarther's January 2, 2018 reply reiterates that the communications sought are not relevant and argues, based upon Carolyn's assertions, anyone with whom Nataliya has discussed the litigation could be served with a subpoena.[44] She alleges the subpoena has an intimidating effect on Nataliya and anyone with whom she associates, and the First Amendment protects private parties from disclosing documents related to associational and political activities.[45]

So long as discovery is relevant (relates to a claim or defense of the party seeking the discovery) and is reasonably likely to uncover admissible evidence, it is allowable unless protected under Rule 26 because the discovery involves privileged documents, is unreasonably cumulative or duplicative, unduly burdensome or expensive, or causes the party or person who is subject to the discovery "annoyance, embarrassment, oppression, or undue burden or expense." The objecting party or person has the burden of showing that discovery should be limited.

---

[43] Resp't's Resp. in Opp'n to McCarther's Mot. for Protective Order, ¶ 5, ¶ 7.

[44] McCarther's Answer to Resp't's Resp. in Opp'n to McCarther's Mot. for Protective Order, ¶ 2 (Jan. 2, 2018).

[45] *Id.,* ¶ 8-9.

I find that McCarther has not met her burden of showing that the materials sought will not reasonably uncover relevant information. Although the communications occurred subsequent to the execution of the pre- and post-nuptial agreements, I conclude they are reasonably likely to inform whether those agreements are enforceable. As discussed above (related to preliminary injunctive relief), the enforceability of pre- or post-nuptial agreements is extremely fact sensitive, involving an analysis of all of the relevant circumstances surrounding the execution of the agreement and the parties' relationship. The expansive scope of that analysis supports permitting the discovery requested here. The documents requested by the subpoena are not overly broad and the subpoena requests only those communications discussing the decedent's estate, this litigation and the related Family Court litigation.

Further, I do not find that McCarther has shown that the subpoena, including its service at her workplaces (particularly since service was attempted at her home first, and failed) causes the degree of annoyance, harassment, embarrassment, oppression, or undue burden or expense, that would justify limiting discovery. Gathering the information required by the subpoena will be an imposition on McCarther, but she has not presented evidence to show that providing that

information would be unduly burdensome.[46]  Accordingly, I recommend that the Court deny McCarther's motion for a protective order.

### C. Nataliya's Discovery Motions

On November 7, 2017, Nataliya filed a motion to quash Carolyn's subpoena issued to Main Street Court LLC on October 25, 2017, which sought documents relating to Nataliya's apartment lease.  Nataliya claims that any information requested by that subpoena is irrelevant to this action, a "fishing expedition," and amounts to harassment.  Carolyn responds that Nataliya has no standing to move to quash the subpoena to a third-party, citing *Cede & Co. v. Joule, Inc.*[47]

On December 22, 2017, Nataliya filed a motion to quash the subpoena issued to McCarther and asked the Court to prohibit Carolyn from conducting "further third party discovery on absolutely non-related matters."[48]  The motion identifies Carolyn's subpoenas to McCarther, Main Street LLC, and PNC Bank, which requested information on Nataliya's personal bank account.  Nataliya alleges that the three subpoenas seek irrelevant information related to her personal life and amount to harassment.  She asserts the issue in this litigation is the validity of the nuptial agreements, which were executed in 2010 and 2012, so that information

---

[46] McCarther cites *El Paso LP Derivative Litigation*, C.A. No. 7141-CS (Del. Ch. Apr. 15, 2013)(TRANSCRIPT) as support for limiting third party discovery that is found to be unduly burdensome.  Further, the circumstances in the *El Paso* case are distinguishable, since the third parties in that case had no direct knowledge of the matter being litigated in that case. *Id.* at 11, 23.

[47] 2005 WL 736689, at *1 (Del. Ch. Feb. 7, 2005).

[48] Pet'r's Mot. to Quash Resp't's Subpoena Issued to McCarther, 4 (Dec. 22, 2017).

about her current lease and bank account, or communications with McCarther, who she did not know in 2010 - 2012, are not relevant. She further argues Carolyn incorrectly cited the *Cede* case because it has been overruled by a transcript ruling.[49] In Nataliya's January 12, 2018 answer, she concludes that the subpoena was issued in "bad faith," "unreasonably cumulative," and the burden and expense of the proposed discovery "outweighs its likely benefits."[50]

Carolyn's response to Nataliya's motion to quash the subpoena issued to McCarther reiterates many of the arguments contained in her responses to McCarther's motion for a protective order.[51]

In considering Nataliya's motions to quash the Main Street Court LLC and the McCarther subpoenas, and to prohibit further discovery of non-parties related to "non-relevant" matters, the first issue is whether Nataliya has standing to object to subpoenas issued to non-parties under Rule 45. The Court in *Cede & Co. v. Joule, Inc.*, relied on federal law to hold that "when a subpoena is issued to a non-party, a party does not have standing to object to the subpoena unless production of documents pursuant to the subpoena would violate a privilege held by the objecting party."[52] The transcript ruling cited stated that a party in that case had standing to

---

[49] *Id.*, 2 (citing *Feeley v. NHAOCG, LLC,* C.A. 7304-VCL (Del. Ch. August 16, 2012)(TRANSCRIPT)).

[50] Nataliya's Answer to Resp't's Resp. in Opp'n to McCarther's Mot. to Quash (Jan. 12, 2018).

[51] Resp't's Resp. in Opp'n to Pet'r's Mot. to Quash Subpoena Duces Tecum issued to McCarther, ¶ 10.

[52] 2005 WL 736689, at *1 (Del. Ch. Feb. 7, 2005).

object to subpoenas that were "grossly disproportionate to the proceeding and burdensome in the context of the overall proceeding," because "only the party is in a position to raise" that type of objection as related to enforcement of Court of Chancery Rule 26.[53] I decline to follow the unreported transcript ruling, and instead rely on the *Cede* holding, since Nataliya has not presented evidence that the subpoenas at issue are extremely burdensome, which was the basis for the transcript ruling. Accordingly, I find that Nataliya does not have standing to object to the third-party subpoenas and, as a result, recommend that the Court deny Nataliya's motions to quash and for a protective order for future third-party discovery.[54]

### D. Carolyn's Motion to Compel and for Attorneys' Fees

Carolyn has moved to compel McCarther to produce the documentation sought by her subpoena, and seeks attorneys' fees under Court of Chancery Rules 26(c) and 37(a)(4) related to McCarther's motion for a protective order under Rule 26(c) and to Nataliya's motions to quash and to prohibit further discovery of non-parties. Rule 37(a)(4) provides that if a motion to compel is granted, the Court shall, after allowing the parties an opportunity to be heard, require the party whose conduct necessitated the motion to pay the movant's attorneys' fees incurred in obtaining the

---

[53] *Feeley v. NHAOCG, LLC,* C.A. 7304-VCL, at 3-5. This transcript is not reported in regular research services, but is available at https://www.morrisjames.com/blogs-Delaware-Business-Litigation-Report,court-of-chancery-upholds-standing-to-object-to-subpoenas.

[54] Because I find that Nataliya does not have standing to challenge the subpoenas based upon the record before me, I will not address her underlying claims in support of quashing the subpoenas or requesting an order prohibiting further non-relevant third-party discovery.

order, "unless the Court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust." Rule 26(c) provides that if a motion for a protective order is denied, the Court may, "on such terms and conditions as are just," order the payment of attorneys' fees related to that motion under the provisions of Rule 37(a)(4).

I decline to recommend that the Court grant Carolyn's motion to compel discovery against McCarther. McCarther is representing herself *pro se* and her positions in seeking to protect herself from producing the documents sought in the subpoena have some basis. This recommendation reflects a degree of leniency, because of McCarther's *pro se* status, and allows McCarther a reasonable amount of additional time to comply with the subpoena before she would be compelled to do so.[55] Accordingly, McCarther is ordered to comply with the subpoena by producing the documents sought within 30 days after this Report becomes final. Since I am recommending that Carolyn's motion to compel be denied, an award of attorneys' fees is not warranted at this time. Further, although attorneys' fees may be ordered when a motion for a protective order is denied, I also do not recommend that the Court order the payment of attorneys' fees related to the denial of McCarther's motion for a protective order based upon the same reasons as noted above.

---

[55] Courts have the discretion to "exhibit some degree of leniency toward a *pro se* litigant, in order to see that his case is fully and fairly heard." *Durham v. Grapetree, LLC*, 2014 WL 1980335, at *5 (Del. Ch. May 16, 2014).

And, for similar reasons as indicated for McCarther's discovery motions, I do not recommend that the Court award attorneys' fees against Nataliya related to her discovery motions. However, this serves as a warning to Nataliya and McCarther that they are not likely to receive the same level of leniency related to future discovery disputes.

**CONCLUSION**

For the foregoing reasons, I recommend that the Court deny Nataliya's motions for a preliminary injunction, and her and McCarther's motions to quash subpoenas and for protective orders. I also recommend that the Court decline to grant Carolyn's motion to compel at this time, and reject Carolyn's request for attorney's fees. This is a final report. Exceptions may be taken pursuant to Court of Chancery Rule 144.

Sincerely,

/s/ Patricia W. Griffin

Patricia W. Griffin
Master in Chancery

PWG/kekz