# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRENTON MARCKESE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-1342-KSJM |
| | ) | |
| DELAWARE SOLID WASTE AUTHORITY, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Date Submitted: December 27, 2024
Date Decided: January 3, 2025

Angelica M. Mamani, HUDSON, JONES, JAYWORK & FISHER LLC, Dover, Delaware; *Counsel for Petitioner Brenton Marckese.*

Michael W. Teichman, PARKOWSKI, GUERKE & SWAYZE, P.A., Dover, Delaware; *Counsel for Respondent Delaware Solid Waste Authority.*

**McCORMICK, C.**

This lawsuit is a tribute to the life of Petitioner Brenton Marckese's Clydesdale, Michigan Breeze, who died from a hit and run the week before Christmas. Mr. Marckese was thrown from Breeze in the car accident and taken to the hospital. He learned after his release that Breeze was euthanized and that her body was taken to a landfill operated by Respondent, the Delaware Solid Waste Authority ("DSWA"). Mr. Marckese desires a more dignified end for his horse. He asks the court to order the landfill to allow him to retrieve Breeze's body for cremation. He requests this relief through the procedural vehicle of a motion for a temporary restraining order. Regrettably, the court cannot grant Mr. Marckese's motion. DSWA does not know exactly where Breeze's remains lie. They have isolated the location to an acre of land approximately ten feet deep, where three other large animal carcasses were deposited the same day. There is no doubt that Mr. Marckese would dig up that entire acre himself, given access and a shovel. But there are very good reasons for preventing Delawareans from digging in landfills to unearth animal carcasses, no matter how loved the animal. Balanced against these interests, the motion fails.

## I.    FACTUAL BAKCGROUND

The facts are drawn from Mr. Marckese's Petition and Motion for TRO, as well as exhibits attached to DSWA's Response in Opposition to the Petition for TRO, including an affidavit from DSWA's Chief Facilities of Management, Mr. Jason M. Munyan. The court held hearings by Zoom on December 24 and 27, 2024. Mr.

Marckese and Mr. Munyan testified during the December 27 hearing, and this factual background draws from their testimony as well.[1]

### A. Mr. Marckese, Breeze, And The Tragic Events Leading To This Litigation

Mr. Marckese has loved horses most of his life and, about ten years ago, he decided to buy his own. He had a fondness for Clydsdales from an early age.[2] Fortuitously, one came up for sale in the winter of 2014 through 2015.[3] Mr. Marckese agreed to buy her "sight unseen," and he drove to Michigan to bring her home.[4] Breeze grew to be an incredible horse by Mr. Marckese's standards.[5] Mr. Marckese stabled Breeze at local farms and invested tremendous care and time training her.[6] In 2024, Mr. Marckese began boarding Breeze at Redstone Ranch in Hartly, where he helped the owner, Danielle, clean-up the property.[7]

While on the ranch, Mr. Marckese met another boarder engaged in the unethical breeding and sales of horses.[8] Through that experience, he witnessed

---

[1] *See* C.A. No. 2024-1342-KSJM Docket ("Dkt.") 1 ("Petition" and "Motion for TRO"); Dkt. 6, Exhibit A ("Munyan Aff."), Exhibit B (DNREC Letter), Exhibit C (Sandtown Landfill Permit). At the time of writing this decision, a transcript of the December 27 hearing was available in draft form, and this decision cites to that at "Draft 12/27/24 Hr'g Tr." at page and line numbers. These citations might not align with the final transcript. If a revised opinion would be helpful, the court will provide one.

[2] Draft 12/27/24 Hr'g Tr. at 34:8–20.

[3] *Id.* at 10:22–11:17.

[4] *Id.*

[5] *Id.*

[6] *Id.* at 11:12–12:10.

[7] *Id.*

[8] Draft 12/27/24 Hr'g Tr. at 15:15–16:13.

horses bought from kill pens be misused, expire, and then be carted off to the landfill.[9] He informed Danielle of the boarder's illicit activities and made clear to Danielle that he would never send Breeze's body to a landfill. [10] "My animals get cremated," he said.[11]

Mr. Marckese, who has a job in construction, made a daily ritual of visiting Breeze after work. He would go to the ranch, "bring her in from the field, . . . groom her, tack her up, and . . . go for a short ride."[12] During their ride on December 17, 2024, a vehicle struck Mr. Marckese and Breeze.[13] The impact threw Mr. Marckese from Breeze.[14] When Mr. Marckese came to moments later, he was partially pinned under Breeze's body.[15] He groaned for help, but the vehicle squealed off.[16]

Another driver stopped within minutes and contacted emergency services.[17] Mr. Marckese had unpinned himself from Breeze by that time but was injured.[18] He could tell that Breeze too was injured, and he laid with her as long as he could.[19]

---

[9] *Id.* at 17:2–11, 31:5–14.

[10] *Id.*

[11] *Id.* at 17:5–7.

[12] *Id.* at 8:8–13.

[13] *Id.* at 26:20–27:3.

[14] Draft 12/27/24 Hr'g Tr. at 12:11–18.

[15] *Id.* at 12:15–21.

[16] *Id.* at 13:3–16.

[17] *Id.* at 14:7–19.

[18] *Id.* at 14:22–15:12.

[19] *Id.*

Ultimately, Danielle arrived on the scene and contacted Breeze's farrier, Sam, and a veterinarian.[20] Mr. Marckese did not expressly place Breeze in anyone's care nor was he able to provide instructions regarding Breeze to anyone before he was taken to the hospital.[21]

Mr. Marckese was examined and given pain medication—which he was reluctant to take—at the hospital.[22] While at the hospital, Mr. Marckese learned that Breeze had been euthanized but was unsure of what had happened to her remains.[23] He was released in the early hours of December 18.[24] His girlfriend drove him home.[25] Later that day Mr. Marckese learned that Sam had called a contractor to retrieve Breeze's body.[26] After calling the contractor, Mr. Marckese learned that Breeze's body had been taken to the Sandtown Landfill, in Felton.[27] Mr. Marckese arrived at the landfill at 7 a.m. the next morning to make arrangements to retrieve Breeze's body.[28]

---

[20] Draft 12/27/24 Hr'g Tr. at 17:10–18:1, 23:24–24:16, 29:24–30:17.

[21] *Id.* at 30:20–31:3.

[22] *Id.* at 18:17–19:22.

[23] *Id.* at 19:10–16.

[24] *Id.* at 20:2–11.

[25] *Id.* at 20:12–14.

[26] *Id.* at 21:5–8.

[27] *Id.* at 21:12–17.

[28] *Id.* at 21:18–23.

## B.     The Risks Of Excavating Modern Landfills

When Mr. Marckese arrived at the Sandtown Landfill, he was told by landfill management that he would need a court order to search the site and remove Breeze's body. This position is consistent with state health and safety regulations prohibiting the public from scavenging landfills,[29] according to DSWA Chief of Facilities Management Jason Munyan. Mr. Munyan has 25 years of experience as an engineer and is responsible for operations of the Sandtown Landfill.[30]

As Mr. Munyan explained, Sandtown is a modern sanitary landfill constructed with a base layer geomembrane liner to prevent liquids, known as "leachate," from percolating through landfilled waste and contaminating groundwater.[31] This liner can be damaged by heavy equipment, especially when operated by persons unfamiliar with the landfill environment.[32] At best, a damaged liner is an expensive repair; at worst, the damage goes undetected, and groundwater supplies are threatened by escaping leachate.[33]

---

[29] Sandtown is a modern sanitary landfill designed, built, and operated in accordance with the Federal Resource Conservation and Recovery Act, codified at title 42, section 6901 of the U.S. Code, governed by title 7, section 1301 the Delaware Administrative Code. Munyan Aff. ¶4. Under 7 Del. Admin. Code 1301-5.9.5.4, "[s]cavenging is prohibited on any landfill site."

[30] Munyan Aff. ¶¶ 1–2.

[31] *Id.* ¶ 5.

[32] *Id.*

[33] *Id.*

Sandtown has a "working face" open to waste haulers where waste is deposited during daily operations.[34] At the end of every day, the working face is covered with a layer of soil, called "daily cover," to prevent the escape of odors and pathogens, and to prevent vermin from accessing the waste.[35] Once a disposal area reaches its maximum capacity, it is covered with a "cap" consisting of a geomembrane covering and topped with a layer of soil with stabilizing vegetation.[36]

The decomposition of solid waste in landfills generates substantial quantities of landfill gas, which typically consists of methane and carbon dioxide with trace amounts of other compounds such as hydrogen sulfide.[37] Landfill gas is smelly, flammable, toxic, and bad for the environment.[38] The potential for dangerous gases to collect in low lying areas such as trenches or pits is significant enough that DSWA requires its employees to wear personal monitors to detect hydrogen sulfide.[39] To prevent landfill gas from escaping into the environment, DSWA engineers install a network of wells, connected by pipes, within the growing Sandtown Landfill.[40] The landfill cap, along with daily cover, also helps constrain the landfill gas.[41]

---

[34] *Id.* ¶ 6.

[35] *Id.*

[36] Munyan Aff. ¶¶ 6–7 (explaining that landfill gas poses a risk as a greenhouse gas, can also create unpleasant odors for neighboring properties, can cause sickness or even death in concentrated amounts, and poses an explosion risk when contained).

[37] *Id.* ¶ 7.

[38] *Id.*

[39] *Id.* ¶ 9.

[40] *Id.* ¶ 8.

[41] *Id.*

Excavating a landfill risks creating pathways that allow gas to escape the landfill, vermin to access the waste, and pathogens to spread to those in proximity and the environment generally.[42] Excavating with heavy equipment poses the additional risk of damaging the landfill infrastructure—the collection system, cover, caps, and liner.[43]

Given these health and safety risks, if Mr. Marckese were permitted to scavenge the working face for the remains of his horse, DSWA would be required to suspend working face operations.[44] This would require DSWA to prepare a new working face with a new stone pad and possibly a new access road to accommodate daily operations.[45] DSWA would also need to staff an excavation with trained engineers, given the risks.[46]

No member of the public has ever been granted access to a landfill for the purpose of retrieving a personal item during Mr. Munyan's 19-years with DSWA.[47] But Mr. Munyan estimates, based on the cost of recent construction, that a safe excavation would run approximately $25,000 per day.[48]

---

[42] Munyan Aff. ¶ 9.

[43] *Id.*

[44] *Id.* ¶ 11.

[45] *Id.*

[46] *Id.*; Draft 12/27/24 Hr'g Tr. at 59:6–60:16.

[47] Draft 12/27/24 Hr'g Tr. at 50:8–51:5.

[48] Munyan Aff. ¶ 12; Draft 12/27/24 Hr'g Tr. at 51:6–24.

### C. Additional Complications With Excavating Animal Carcasses

Adding further complication to Mr. Marckese's request, the Sandtown Landfill is in a rural area where landfilling large animal carcasses is common.[49] On December 18 alone, Sandtown received *four* large animal carcasses, including Breeze, from John F. Kohout Animal Carcass Removal, a licensed and permitted independent contractor who collects waste from clients to deliver to the landfill.[50]

DSWA knows the general area where Breeze's body was placed—it is "in a row roughly ten feet in thickness known as a 'lift' approximately one acre in area."[51] They do not know precisely where in that area Breeze's body is located, except that it is "standard operating procedure to make sure carcasses are at the bottom of the lift to ensure complete coverage and minimize the potential to create the visual that may be considered disturbing to some customers."[52] During the December 27 hearing, DSWA presented video evidence of one of Mr. Kohout's recent deliveries reflecting this standard operating procedure.[53] If this procedure was followed with Breeze, then her body was covered with a considerable amount of waste immediately upon deposit.

### D. This Litigation

After Mr. Marckese was instructed that he would need a court order to retrieve Breeze's body, he retained counsel and submitted a petition at the close of business

---

[49] Munyan Af. ¶ 3.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] Draft 12/27/24 Hr'g Tr. at 54:9–58:17.

on December 23, claiming unlawful detention of chattel, conversion, and replevin. With the petition, counsel filed a motion to expedite and a motion for a temporary restraining order ("Motion for TRO"). The Motion for TRO order asked that the court enjoin DSWA from barring Mr. Marckese from the landfill and allow him to retrieve Breeze's remains.[54]

### E.    The First TRO Hearing

The court was made aware of the December 23 petition on Christmas Eve. Given the obvious concern of decay, along with the risk that Breeze would become unretrievable due to the deposit of other waste, the court held an emergency Zoom hearing on the Motion for TRO at 8:00 p.m. on Christmas Eve. Mr. Marckese and counsel for both parties were present. At the hearing, counsel for Mr. Marckese modified his request for a TRO to ask that no further activity occur on the portion of the landfill where Breeze's body was placed until the court could consider Mr. Marckese's motion on its merits. DSWA did not oppose that request, which the court granted. The court also requested that the parties complete briefing on Mr. Marckese's original Motion for TRO by the morning of Friday, December 27.

### F.    The Second TRO Hearing

The court conducted a second Zoom hearing on the afternoon of December 27, during which the parties presented evidence and argument on Mr. Marckese's request to obtain Breeze's remains. In addition to counsel for the parties, Mr.

---

[54] Counsel was in a rush (understandably) to make the initial filing on December 23, and the Register in Chancery rejected that filing and the follow-on attempt to fix it given filing errors. The court staff accepted it on the docket on December 26. Dkt. 1.

Marckese, Mr. Munyan, and counsel for non-party the Delaware Department of Natural Resources and Environmental Control attended.

## II.    LEGAL ANALYSIS

Mr. Marckese "seeks the return of his horse's remains[.]"[55]  DSWA opposes the request on two grounds.  DSWA first argues that the court lacks subject matter jurisdiction over this action.[56]  DSWA next argues that Mr. Marckese has not made the necessary showing to obtain the relief he seeks.[57]

### A.    Subject Matter Jurisdiction

"As Delaware's Constitutional court of equity, the Court of Chancery can acquire subject matter jurisdiction over a cause in only three ways . . . :  (1) one or more of the plaintiff's claims for relief is equitable in character, (2) the plaintiff requests relief that is equitable in nature, or (3) subject matter jurisdiction is conferred by statute."[58]

Mr. Marckese argues that this court has jurisdiction because he seeks injunctive relief, which is an equitable remedy.[59]  DSWA advances two arguments in response.  First, DSWA argues that Mr. Marckese's claim is primarily one for

---

[55] Dkt. 3 ("Pet'r's Supp. Br.") at 1.

[56] Dkt. 6 ("Resp't's Opposition Br.") at 9–10.

[57] *Id.* at 10–12.

[58] *Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004) (citing 10 *Del. C.* §§ 341–42)).

[59] 12/26/24 Hr'g Tr. at 86:3–24.

10

replevin, which is legal and not equitable.[60]   Second, DSWA argues Mr. Marckese

otherwise has an adequate remedy at law in the form of monetary damages.[61]

DSWA's first argument is accurate but irrelevant.   Mr. Marckese asserts a

claim of replevin, which is "a form of action for the recovery of personal property

which has been taken or withheld from the owner unlawfully."[62]   Replevin is a legal

and not equitable claim, as DSWA correctly argues.[63]   But the Court of Chancery can

assert jurisdiction over actions for replevin under the clean-up doctrine where other

aspects of the case warrant injunctive relief,[64] like here.   Mr. Marckese initially

sought to prevent DSWA from further covering the location in which the remains

were placed to improve his chances of recovering them.   That was a request for

injunctive relief, over which the court properly asserted jurisdiction.   Having asserted

---

[60] Resp't's Opposition Br. at 10.

[61] *Id.* at 9–10.

[62] *Taylor v. Snyder*, 741 A.2d 17 (Del. 1999).

[63] Resp't's Opposition Br. at 10 (citing *MAI Basic Four, Inc. v. Generic Bus. Sols., Inc.*, 1990 WL 3665, at *3 (Del. Ch. Jan. 16, 1990) (replevin is a legal remedy); *Finnegan v. Foraker*, 1977 WL 5178, at *3 (Del. Ch. June 29, 1977) (same)); *see also* Donald Wolfe & Michael Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, Second Edition § 16.01[b] (Matthew Bender & Co., 2024) ("Nor can it be said that restitutionary relief to recover specific real or personal property is exclusively equitable, for, as noted, the common law could grant *in specie* restitution through forms of action such as replevin, detinue, and ejectment.").

[64] *See FirstString Research, Inc. v. JSS Med. Research Inc.*, 2021 WL 2182829, at *6 (Del. Ch. May 28, 2021) ("The 'clean-up doctrine' gives this court ancillary jurisdiction to resolve purely legal causes of action that are before it as part of the same controversy over which the Court originally had subject matter jurisdiction in order to avoid piecemeal litigation.").

jurisdiction for the purpose of hearing the initial request for emergency relief, the court can exercise clean-up jurisdiction over Mr. Marckese's claim for replevin.[65]

Because the court has a valid basis to exercise jurisdiction under the clean-up doctrine, DSWA's second argument falls by the wayside. That argument is also misguided. DSWA argues that Mr. Marckese could sue Danielle or Sam or both for monetary damages on the theory that they exceeded the scope of their supposed agency by directing that Breeze's body be taken to the dump.[66] Even if the record supported a factual finding that Mr. Marckese empowered Danielle as his agent as he left in an emergency vehicle to the hospital, or indirectly empowered Sam who was not present with similar authority,[67] DSWA's theory would not work. The property at issue—Breeze's remains—is unique and of no value to anyone but Mr. Marckese. Monetary damages would not afford complete recovery.[68]

The Court of Chancery, therefore, has subject matter jurisdiction over this action.

---

[65] *See Jarvis v. Elliott*, 2010 WL 761089 (Del. Ch. Mar. 5, 2010), *judgment entered* 2010 WL 761086 (Del. Ch. Mar. 5, 2010) (retaining jurisdiction over replevin claim to retrieve racecar engine although the claim that gave rise to equitable jurisdiction had been withdrawn).

[66] Resp't's Opposition Br. at 9–10.

[67] The record does not support these factual findings.

[68] *Wilkerson v. Benton*, 1990 WL 3900, at *1 (Del. Ch. Jan. 17, 1990) (noting that full and complete relief cannot be accomplished by the award of money damages where plaintiff seeks "the recovery of land or unique goods").

## B.    Injunctive Relief

"A TRO is used in emergencies, typically at the outset of a case."[69]  It has two purposes: "to protect the status quo and prevent imminent irreparable harm pending a preliminary injunction or final adjudication."[70]  Typically, to prevail on a motion for a TRO, a party must demonstrate that she has a colorable claim on the merits, she will suffer irreparable harm if relief is not granted, and the hardships balance in her favor.[71]

Although Mr. Marckese has moved for a TRO, his request to regain possession of Breeze's remains amounts to a request for final, complete relief.  Thus, although he styles his request as a motion for TRO, what Mr. Marckese really seeks is a permanent injunction.  "Unlike TROs . . . a court issues a permanent injunction at the end of the case, after a trial on the merits, as part of an award of final relief."[72]  To secure a permanent injunction, a party must demonstrate that "other remedies are inadequate.  A showing of irreparable harm can satisfy that requirement."[73]  Additionally, a party must show actual success on the merits and that the balance of the equities favors entry of the requested injunction.[74]

---

[69] *In re COVID-Related Restrictions on Religious Services*, 285 A.3d 1205, 1226 (Del. Ch. Nov. 21, 2022), *aff'd* 2024 WL 3616269, at *8 (Del. Aug. 1, 2024).

[70] *CBOT Hldgs., Inc. v. Chi. Bd. Option Exch., Inc.*, 2007 WL 2296356, at *3 (Del. Ch. Aug. 3, 2007).

[71] *Stirling Inv. Hldgs., Inc. v. Glenoit Universal, Ltd.*, 1997 WL 74659, at *2 (Del. Ch. Feb. 12, 1997).

[72] *In re COVID-Related Restrictions*, 285 A.3d at 1228.

[73] *Id.*

[74] *In re COVID-Related Restrictions*, 2024 WL 3616269, at *8.

Even assuming the court found that Mr. Marckese had succeeded on the merits of his replevin claim and that he faces irreparable harm, the court cannot issue a permanent injunction because Mr. Marckese has not shown that the equities tilt in his favor.

Balancing the equities requires a court to compare the relative importance of interests that defy conventional approaches to valuation. In that way, it is an unenviable task, particularly where the competing interests are so disparate as to seem totally incomparable. This case is a prime example. How does one compare the solace of knowing that the remains of one's beloved animal companion have been treated with dignity against the dangers of disturbing a meticulously engineered landfill? Forget comparing apples to oranges, it's more like comparing apples to differential calculus.

There is clarity, however, as to one factor that carries the day here—the potential for harm to the health and safety of others.[75] Landfills are delicate things.[76]

---

[75] *See DeMarco v. Christiana Care Health Servs., Inc.*, 263 A.3d 423, 438 (Del. Ch. 2021) ("It is . . . appropriate to consider public policy and the impact an injunction will have on the public and on innocent third parties." (internal quotation marks omitted) (footnotes omitted)); *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 587 (Del. Ch. 1998) ("It is also appropriate to consider the impact an injunction will have on the public and on innocent third parties."); *Delaware River & Bay Auth. v. Delaware Outdoor Advert., Inc.*, 1998 WL 83056, at *5 (Del. Ch. Feb. 20, 1998) (public safety risk weighing in favor of DelDOT and DRBA injunction requiring defendant to obtain a permit before erecting sign along highway).

[76] Draft 12/27/24 H'rg Tr. at 48:1–18 (Munyan) (explaining that landfills "have a mind of their own" and DSWA has "a plan that we follow as far as how we're going to build them and construct them and install these pipes to collect gases" "[b]ut sometimes it becomes more odorous, and we have to put in more than was planned").

They must both contain waste and capture waste's hazardous byproducts—leachate, gases, disease, and the like. And descriptions of landfills sound like lines from futuristic stories (*e.g.*, "geomembrane liners") or conjure scenes from science fiction films (*e.g.*, landfills require "miles of pipe buried within the waste" to redirect deadly gases and daily coverings to stave off vermin).[77] Any disturbance to a landfill risks damaging their health and safety protections, exposing DSWA's workers and Felton's residents to serious harm. The potential precedent of granting the motion could pose even greater harm, as the risks present here would rise exponentially were any animal owner allowed to dig-up her inadvertently landfilled companion. The potential for such harm outweighs any right Mr. Marckese has to retrieve the remains of his beloved horse.

## III. CONCLUSION

The court does not issue this decision lightly. Mr. Marckese's love for Breeze is undeniable, and his desire to treat her remains with respect is most praiseworthy. Mr. Marckese's Motion for a TRO, however, is denied.

---

[77] *Id.* at 45:21–46:8; Munyan Aff. ¶ 6.